UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

IRVING J. MARQUEZ,

    Plaintiff,

vs.                                                                              11-CV-838 JAP/WDS

BOARD OF COUNTY COMMISSIONERS
EDDY COUNTY,
VICTOR E. MARTINEZ, JR.,
DARREN JONES,
RUTH ANN WALKER,
SAL REY SALCIDO, and
DANETTE MARTINEZ,

    Defendants.

## MEMORANDUM OPINION AND ORDER

Defendants have moved for summary judgment arguing that they are entitled to qualified immunity from all federal claims brought under 42 U.S.C. § 1983. *See* DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. No. 41) (Motion).  Because Plaintiff has presented evidence sufficient to raise a dispute of material facts as to whether Defendants violated his Fourteenth Amendment rights, the Court will deny the Motion.[1]

I.  Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light

---

[1] In ruling on the Motion, the Court has considered PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. No. 48) (the Response) and DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT (Doc. No. 53) (the Reply).

most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).

The party seeking summary judgment bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted). Once the movant meets this burden, Rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

When a defendant seeks summary judgment on the issue of qualified immunity, the responsibility shifts to the plaintiff to meet a "heavy two-part burden." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). The plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated the plaintiff's constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged unlawful activity. *See Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). If the plaintiff fails to satisfy the plaintiff's two-part burden, the court must grant the defendant qualified immunity. *Id.* In determining whether the plaintiff has met the plaintiff's burden of establishing a constitutional violation that was clearly established, a court construes the facts in the light most favorable to the plaintiff as the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 378–80 (2007); *Riggins*, 572 F.3d at 1107 (noting that the Tenth Circuit "accept[s] the facts as the plaintiff alleges them"). This means that the Court "ordinarily must 'adopt plaintiff's 'version of the facts.' " *Thompson v. Salt Lake City*, 584 F.3d 1304, 1325 (Holmes, J. concurring). Courts must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may . . . serve as the foundation for answering

2

the *legal* question before the court" before inquiring into whether there are genuine issues of material fact for resolution by the jury. *Thompson*, 584 F.3d at 1326–27 (Holmes, J. concurring) (citing *Goddard v. Urrea*, 847 F.2d 765, 770 (11th Cir.1988)(Johnson, J., dissenting)). If the plaintiff establishes both elements of the qualified immunity test, then the court may grant summary judgment if the defendant shows "'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000) (quoting *Albright v. Rodriquez*, 51 F.3d 1531, 1535 (10th Cir. 1995)).

II. Background

A. The Investigatory Stop And Arrest

The facts, viewed in the light most favorable to Plaintiff, are as follows:[2] On September 24, 2009 at about 7:00 am, Plaintiff, a resident of El Paso, Texas, was driving his truck in Eddy County, New Mexico. (Am. Compl. ¶ 15.) Unbeknownst to Plaintiff, he was suffering from West Nile Virus. (*Id.* ¶ 16.) Defendant Victor E. Martinez, Jr., a Deputy with the Eddy County Sheriff's Department (Deputy Martinez), observed Plaintiff going the opposite direction from his patrol vehicle. Deputy Martinez saw Plaintiff cross the middle line of the road and almost collide head on with a semi tractor-trailer. (DVD 09:05:20.) Deputy Martinez turned his patrol vehicle around to follow Plaintiff with the warning lights engaged. Plaintiff moved to the side of the road. (DVD 09:05:27-09:05:48.) As Deputy Martinez pulled behind Plaintiff's truck, his patrol vehicle's dash cam shows Plaintiff maneuvering his truck to the right shoulder, colliding with the guardrail, and then backing up a few feet and colliding with the guard rail a second

---

[2] As Exhibit 1 to the Motion, Defendants submitted a DVD of the dash cam video from the patrol vehicle of Deputy Martinez. References to the DVD will be cited with a time stamp. The time indicated on the DVD, however, seems to be off by two hours. The time stamp numbers are for reference purposes only.

time. (DVD 09:05:39-09:05:48.)  When Plaintiff stepped out of his truck, he appeared to be staggering and was unable to keep his balance. (DVD 09:06:00-09:06:16.)  Deputy Martinez asked Plaintiff if he had been drinking, and Plaintiff denied using alcohol or drugs. (DVD 09:06:20.)  Plaintiff informed Deputy Martinez that he was sick and had taken NyQuil for his symptoms. (Am. Compl. ¶ 23; DVD 09:07:10-09:07:33.)  Plaintiff consented to take a Breathalyzer test, which registered "zero," indicating no alcohol use. (Am. Compl. ¶ 24; DVD 09:10:06-09:10:56.)

   Deputy Jones, a Reserve Deputy with the Eddy County Sheriff's Department (Deputy Jones), arrived and both Deputies searched Plaintiff's truck for signs of alcohol or drugs. (DVD 09:11:03.)  Deputy Martinez explained to Deputy Jones that Plaintiff appeared to by intoxicated but blew a zero on the SP5 Breathalyzer, and Deputy Martinez also reported to Deputy Jones that Plaintiff did not smell like alcohol. (DVD 09:11:03-09:12:37.)  Noting that Plaintiff was not fit to drive, Deputy Martinez asked Plaintiff if he had taken any prescription medication, and Plaintiff answered "no." (DVD 09:12:56-09:13:01.)  Deputy Martinez asked Plaintiff if he remembered almost hitting the semi tractor-trailer head on, but Plaintiff did not respond. (DVD 09:13:14.)  Deputy Martinez asked Plaintiff if anyone could come to the scene and pick him up. Plaintiff replied "no." ( DVD 09:13:59-09:14:12; Am. Compl.  ¶ 28.)  Deputy Martinez told Plaintiff that he did not think Plaintiff was "under the influence but you driving like that, something's wrong." (DVD 09:14:13.)  Throughout the investigatory stop, Plaintiff was unable to stand without losing his balance, Plaintiff often swayed and was unable to focus on the Deputies' instructions or questions. (*Id.* ¶ 34.)

   Unable to determine what was causing Plaintiff's swaying and obvious mental confusion, the Deputies administered a field sobriety test, which Plaintiff failed. (*Id.* ¶¶ 35, 37.) The dash

cam video shows that Plaintiff was unable to follow Deputy Martinez's finger movements. (DVD 09:15:55-09:17:33.)  Plaintiff was unable to walk a straight line or balance on one foot. (DVD 09:18:43.)  Deputy Martinez asked Plaintiff if Plaintiff had been "smoking meth because [he] was not acting right." (DVD 09:17:16.)  Plaintiff denied using drugs and answered that he was just nervous. (DVD 09:17:49.)  Deputy Martinez asked Plaintiff is he had any medical conditions, and Plaintiff answered "no." (DVD 09:19:00-09:19:17.)  Deputy Martinez asked Plaintiff to balance on one foot.  Plaintiff attempted to do this but swayed and lost his balance several times. (DVD 09:19:19-09:22:30.)  Plaintiff could not walk in a straight line. (DVD 09:22:33-09:23:52.)

Having ruled out alcohol and having witnessed Plaintiff's poor performance of the field sobriety test, the deputies again searched Plaintiff's truck and found no evidence of illegal drug use or alcohol use. (Am. Compl. ¶ 43.)  The Deputies examined Plaintiff's arms looking for signs of illegal drug use, but found none.  (DVD 09:18:25.)  Concluding that something was wrong with Plaintiff, Deputy Martinez arrested Plaintiff for DUI commenting that he had never seen a "sober" person fail a field sobriety test. (Am. Compl. ¶ 46; DVD 09:23:53-09:25:54.)  Deputy Martinez asked Plaintiff if he had a medical condition such as high blood pressure or diabetes, but Plaintiff denied having a medical condition. (DVD 09:26:25-09:27:20.)  Deputy Martinez placed hand cuffs on Plaintiff and seated Plaintiff in the back seat of his patrol vehicle. Deputy Martinez instructed Plaintiff that he was required under New Mexico law to take a blood test, and Plaintiff agreed. (DVD 09:28:00-09:28:05.)  Leaving Plaintiff in the back of his patrol vehicle, Deputy Martinez returned to Plaintiff's truck, and commented to Deputy Jones that Plaintiff denied he had any medical condition. (DVD 09:29:00.)  At no time during the stop did the Deputies seriously discuss the possibility that Plaintiff had a medical condition of which

Plaintiff was unaware; but instead, the Deputies concluded that Plaintiff must have been on drugs or alcohol. Plaintiff was taken to the Carlsbad Medical Center to have his blood drawn. (Am. Compl. ¶ 47.)

In his report, Deputy Martinez stated: "From the time [Plaintiff] was placed in cuffs, transported to the hospital, Sheriff's Department, and Detention Center, Deputy Jones had to hold on to him, due to the fact that Mr. Marquez was unable to keep his balance." (Resp. Ex. 7.)

### B. The Carlsbad Medical Center

At 9:35 am, Plaintiff's blood was drawn at the Carlsbad Medical Center to determine the presence of alcohol or drugs in his blood stream. (*Id.*) Martinez and Jones did not have Plaintiff evaluated for illness at the medical center. (*Id.* ¶ 48.) A few weeks later, the results from the blood test revealed no narcotics in Plaintiff's system. (*Id.* ¶ 85.) Plaintiff alleges that at the time he was stopped, he exhibited signs that he was suffering from either a serious medical condition or a serious neurological disorder for which he needed immediate medical attention and that the Deputies should have had Plaintiff evaluated at the medical center. (*Id.* ¶¶ 48, 49.)

### C. The Eddy County Sheriff's Department

Deputy Martinez and Deputy Jones transported Plaintiff to the Eddy County Sheriff's Department and waited for Plaintiff's paperwork to be completed. (*Id.* ¶ 50.) While at the Sheriff's Department, Plaintiff's condition deteriorated, and Plaintiff was unable to stand without assistance. (*Id.* ¶ 52.) After completing Plaintiff's paperwork, Deputy Martinez and Deputy Jones transported Plaintiff to the Eddy County Detention Center (ECDC). (*Id.* ¶ 53.)

### D. The Eddy County Detention Center (ECDC)

The Deputies brought Plaintiff to the ECDC at approximately 10:30 a.m. Plaintiff could not walk or balance without assistance. (*Id.* ¶ 55.) (Resp. Ex. 7.) At intake, Deputy Martinez and

Deputy Jones told the ECDC intake officers, Sal Rey Salcido (Salcido) and Danette Martinez, that Plaintiff was intoxicated or coming off of some kind of narcotic or drug. The Deputies did not inform ECDC personnel that Plaintiff had registered zero on the Breathalyzer test. (*Id.* ¶ 56.)

At the intake area, Salcido immediately noticed Plaintiff's altered condition and called "for the medical department." (Resp. Ex. 8, Salcido's Report.) (*Id.* ¶¶ 61; 64.) Plaintiff alleges that Salcido and Defendant Danette Martinez had an affirmative obligation to refuse to accept individuals into the ECDC if the ECDC was unable to provide adequate medical care. (*Id.* ¶ 65.) Plaintiff contends that under the ECDC's policy, Salcido and Danette Martinez could not accept a detainee into custody without making sure that an adequate medical screening was performed prior to acceptance. (*Id.* ¶ 68.) Salcido and Danette Martinez booked Plaintiff into custody without having an appropriate medical screening performed prior to acceptance. (*Id.* ¶ 77.)

ECDC Nurse Ruth Ann Walker arrived at the intake area at about 10:30 a.m. and observed Plaintiff's inability to stand, walk, balance, and focus, but Nurse Walker did not take Plaintiff's vital signs. (*Id.* ¶¶ 80, 81, 83.) [3] Nurse Walker spoke to Deputy Martinez, who told Nurse Walker that Plaintiff "was coming off some narcotic or drug." (*Id.* ¶ 85.) Nurse Walker apparently accepted this assessment and instructed Salcido and Dannette Martinez to accept

---

[3] There is a discrepancy in the evidence as to the time that Plaintiff arrived at ECDC. Nurse Walker's notes indicate that she first saw Plaintiff at 10:30 am when he arrived at ECDC, but Nurse Walker's affidavit states that after she reviewed the booking records, she determined that she first saw Plaintiff at 11:30 am. (Mot. Ex. D ¶ 3.) Salcido stated in his report that Plaintiff arrived at ECDC at 11:30 am. (Resp. Ex. 8.) For purposes of ruling on the Motion, the Court must view the facts in the light favorable to Plaintiff; therefore, the Court will consider 10:30 am as the time when Plaintiff arrived at ECDC, which is the time alleged in Plaintiff's Amended Complaint. Since Salcido testifies that he immediately called Nurse Walker to look at Plaintiff, the Court will consider the time that Nurse Walker first saw Plaintiff as being closer to 10:30 am. The one hour time discrepancy, however, has no material bearing on the Court's decision to deny the Motion.

Plaintiff into custody but to call her if Plaintiff's condition got worse. (*Id.* ¶ 86.)

While hand-cuffed to the wall at the ECDC within view of Salcido and Danette Martinez, Plaintiff was struggling to maintain his balance. (Resp. Ex. 8.) (*Id.* ¶ 87.) During the booking process, Plaintiff was unable to answer questions, provide fingerprints, dress himself, or sign paperwork. (*Id.* ¶ 90.) Danette Martinez had to physically hold Plaintiff up while efforts were made to obtain a booking photo of Plaintiff, and Danette Martinez had to clap her hands in an effort to get Plaintiff to focus on her for a photo. (*Id.* ¶ 88.) ECDC intake officers Salcido and Danettte Martinez observed Plaintiff's condition deteriorate for about two and one-half hours without calling for medical attention. (*Id.* ¶ 92.) [4]

### E. Plaintiff Rushed To Emergency Room

At approximately 1:00 p.m., Salcido, concerned about Plaintiff's deteriorating condition, called Nurse Walker, who took Plaintiff's vital signs and discovered that Plaintiff had a fever of 104 degrees. (*Id.* ¶¶ 93, 94.) Plaintiff was immediately transported to a local hospital and then was airlifted to a larger medical facility where he was treated for West Nile Virus. (*Id.* ¶ 95.) Plaintiff now suffers permanent life-altering injuries from brain swelling caused by the delay in treating his high fever. (*Id.* ¶¶ 58, 98.)

### III. PLAINTIFF'S CLAIMS

In Count I of the Amended Complaint, Plaintiff asserts a claim against Deputy Martinez and Deputy Jones under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment alleging that from the time Plaintiff was stopped to the time that Plaintiff was dropped off at ECDC

---

[4] This period accounts for the time that Plaintiff claims he arrived at the ECDC. If Plaintiff arrived at 10:30 am, then Salcido and Danette Martinez observed Plaintiff for two and one half hours before calling Nurse Walker back to intake at 1:00 pm.

intake, Deputy Martinez and Deputy Jones deprived Plaintiff of access to medical care and were deliberately indifferent to the obvious signs that Plaintiff had a serious medical problem. Plaintiff contends that instead of administering field sobriety tests, Deputy Martinez and Deputy Jones should have requested emergency medical services for Plaintiff immediately, but instead, the Deputies actively deprived Plaintiff of access to medical care both at the scene of the traffic stop and at the Carlsbad Medical Center. Plaintiff further alleges that the failure to obtain medical services for him caused him serious permanent injury.

In Count II, Plaintiff asserts a claim against Nurse Walker, Salcido and Danette Martinez under 42 U.S.C. § 1983 alleging that these Defendants violated Plaintiff's Fourteenth Amendment right to adequate medical care. Plaintiff contends that these Defendants should have turned Plaintiff away at intake which would have required the arresting officers to take Plaintiff back to the Carlsbad Medical Center for a medical evaluation. Plaintiff alleges that these Defendants booked Plaintiff into custody without performing the required medical screening. Plaintiff maintains that by accepting Plaintiff into custody and delaying a medical screening, Defendants caused Plaintiff permanent injury.

In Count III, Plaintiff asserts a state law claim against Nurse Walker for professional negligence. In Count IV, Plaintiff also asserts state law several claims under the New Mexico Tort Claims Act (NMSA 1978 §§ 41-4-1 et seq.) against Deputy Martinez, Deputy Jones, Nurse Walker, Salcido, and Danette Martinez for personal injury from 1) the deprivation of constitutional rights by law enforcement officers under the NMTCA (false imprisonment); 2) the negligent operation of a medical facility; 3) negligent health care services; and 4) negligent maintenance of a public building. *See* NMSA 1978 §§ 41-4-6, 41-4-9, 41-4-10, 41-4-12.

IV.  DISCUSSION

Defendants ask the Court to grant summary judgment dismissing Counts I and II of the Complaint, which are the claims asserted under 42 U.S.C. § 1983 for violations of Plaintiff's constitutional right to adequate medical care while Plaintiff was detained, arrested, and jailed. Through the due process clause of the Fourteenth Amendment, persons who are arrested or detained are protected against the denial of adequate medical attention.  *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).  At the time of Plaintiff's arrest and detention in 2009, this right was clearly established.  *See Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1315 (10th Cir. 2002) ("The right to custodial medical care is clearly established.").  Accordingly, the analysis of the qualified immunity question focuses on whether Plaintiff met his burden of showing that Defendants violated his constitutional right to adequate medical care.  To succeed on his claim, Plaintiff must show Defendants were deliberately indifferent to Plaintiff's serious medical needs. *Martinez,* 563 F.3d at 1088.  Neither negligence nor an inadvertent failure to provide adequate medical care are sufficient to establish a constitutional violation. *Id.*

In *Martinez v. Beggs*, the court described the analysis: "The test for deliberate indifference is both objective and subjective. . . . The objective component of the test is met if the 'harm suffered rises to a level "sufficiently serious" to be cognizable under the Cruel and Unusual Punishment Clause' of the Eighth Amendment." *Id.* (citations and quotations omitted). In this case, the objective component has been met because a high fever caused by the West Nile Virus is a serious harm. *Id.*

To prevail on the subjective component, the detainee must show that "the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Id.* at 1089 (citation omitted).  The question under the subjective

component is: were the Plaintiff's symptoms such that a law enforcement officer or corrections officer knew the risk to Plaintiff and chose to disregard it? *Id.*

Defendants contend they are entitled to qualified immunity from these claims because Plaintiffs has failed to show that they were deliberately indifferent, as opposed to merely negligent, in their failure to recognize Plaintiff's severe illness.  Defendants deny knowing that Plaintiff had a serious medical condition, and Defendants contend that Plaintiff did not exhibit obvious signs of illness.[5]  It is undisputed that the Defendants did not know that Plaintiff was suffering from a high fever.  It is undisputed that Plaintiff did not know he was sick and that Plaintiff did not at any time ask for medical attention. (Mot. Ex. E.)  However, Defendants will not be entitled to qualified immunity if the symptoms displayed by Plaintiff were obvious enough to warrant a finding that Defendants knew of the risk of a serious medical condition but disregarded that risk.

> A.  Plaintiff's Expert Opinions

To support his argument that Defendants were deliberately indifferent to his obvious need for medical attention, Plaintiff submits the opinions of several experts.

> 1. Dr. Suite's Opinion

Plaintiff submits the affidavit from Nicholas D.A. Suite, M.D., an expert in internal medicine.  Dr. Suite states that he reviewed the incident report, the criminal complaint, the DUI citation, the arrest report, the blood draw report, the toxicology report, Nurse Walker's notes, ECDC documents including the daily worksheet, the intake photograph of Plaintiff, and the

---

[5] In support of their position, Defendants each submitted an affidavit stating that they were not aware that Plaintiff needed medical care.  For example, Deputy Martinez testified, "I did not observe that Mr. Marquez was in need of medical care."  (Mot. Ex. A ¶ 11.)

notes regarding Plaintiff's behavior as observed by ECDC personnel. (Resp. Ex. 2.) Dr. Suite asserts that he also viewed the dash cam video, the medical center records, Lovelace medical records, Las Palmas Rehabilitation Hospital records, physician's statements, records of a medical examination in October 2010 and a psychiatric evaluation of Plaintiff. Dr. Suite opines that at the time Plaintiff was stopped on the side of the road, Plaintiff was "exhibiting symptoms of a person in obvious need of medical attention due to altered mental status." (Resp. Ex. 2 at 3.) Dr. Suite maintains that if the Sheriffs Deputies or the ECDC personnel would have immediately presented Plaintiff to a medical facility for assistance, he would have received essential treatment and would not have suffered a serious life-long brain injury. (*Id.* at 4.) Dr. Suite asserts that in the dash cam video, Plaintiff appeared to be in an altered mental state and "in clear need of medical attention." (*Id.*) Dr. Suite concludes that after observing Plaintiff's swaying, inability to stand, inability to follow Deputy Martinez's finger movement, inability to communicate, and clear signs of confusion, when the Deputies obtained a breath test that came back zero for alcohol, they should have known that a medical investigation was necessary to "determine and treat the problem." (*Id.*) Dr. Suite opines that Plaintiff suffered from brain seizures while in custody "such that their delay of medical care resulted in substantial insult to his brain causing permanent brain injury[6] that would have been avoided with readily available medical measures." (*Id.*)

### 2. D.P. Van Blaricom's Opinion

Plaintiff also submit the opinion of an expert in law enforcement practices, D.P. Van

---

[6] Dr. Suite stated that Plaintiff suffers from serious life-altering injuries: encephalitis / encephalopathy, seisure disorder, Parkinsonian syndrome, permanent cognitive impairment, mood instability, and personalty change. (*Id.*)

12

Blaricom, who testifies that he reviewed the Amended Complaint, the documents related to Plaintiff's detention and arrest, and the dash cam video. (Resp. Ex. 3.)  Van Blaricom opines that "Sheriff's Deputies Martinez and Jones as well as the Detention Center officers knew or should have known Mr. Marquez faced a substantial risk of harm and they disregarded that risk by failing to take reasonable measures to abate it." (*Id.* at 9.)  Van Blaricom states that "[t]here are many medical conditions that can mimic the characteristics of alcohol and/or drug intoxication and probably the most common of such look-alikes encountered by law enforcement officers in the field is a diabetic reaction[.]" (*Id.* at 11.)  According to Van Blaricom, "[a]lthough law enforcement officers are not trained or expected to be medical diagnosticians, . . . they are trained and expected to recognize medical emergencies, when there is NO accompanying physical evidence of alcohol and/or drug intoxication[.]" (*Id.*) (emphasis in original) Van Blaricom opines that given the information and Plaintiff's worsening condition as they drove to the medical center for the blood draw, the Deputies should have had Plaintiff medically evaluated in addition to having Plaintiff's blood drawn. (*Id.* at 12.)  According to Van Blaricom, the Deputies also improperly "diagnose[d]" Plaintiff as coming off of some drug or narcotic, when they informed ECDC personnel and Nurse Walker of Plaintiff's condition. (*Id.*)

### 3.  Jacqueline Moore's Opinion

Plaintiff submit the opinion of Jacqueline Moore, an independent nurse consultant who specializes in correctional care. (Resp. Ex. 4.)  Ms. Moore reports that based on Plaintiff's physical appearance and behavior, and the failure to seek immediate medical attention, Salcido, Danette Martinez, and Nurse Walker were ". . . willful, wanton and deliberately indifferent to [Plaintiff's] obvious medical needs." (*Id.* at 15.)  According to Ms. Moore, all ECDC personnel involved immediately knew Plaintiff "faced a substantial risk of harm and they disregarded that

risk by failing to take reasonable measures to abate it." (*Id.* at 3.)  Ms. Moore states that Nurse Walker should have evaluated Plaintiff immediately based on her knowledge that Plaintiff had been in a car accident. (*Id.* at 8.)  Ms. Moore also points out that, in Nurse Walker's affidavit and notes, Nurse Walker indicated that when she spoke to Plaintiff he was alert and oriented; however, ECDC Officer Salcido testified that Nurse Walker told him that Plaintiff "was not making sense when she spoke to Mr. Marquez." (*Id.* at 10.)  This evidence supports the inference that Nurse Walker was immediately aware of Plaintiff's altered mental state but recklessly chose not to take Plaintiff's vital signs.

Ms. Moore quotes several ECDC policies including the policy that requires detainees to receive immediate health screens upon arrival at ECDC and the policy that requires immediate medical attention at a hospital for "persons who are unconscious, semiconscious, seriously injured, bleeding, mentally unstable, or otherwise urgently in need of medical attention." (*Id.* at 11-12.)  *See also* Resp. Ex. 13 (Eddy County Detention Center Policy and Procedure on Admissions and Booking).  Ms. Moore states that Correctional Officers Salcido, Danette Martinez, and Nurse Walker violated these policies "because is was evident that Mr. Marquez needed medical attention due to his inability to maintain his balance and inability to focus." (*Id.* at 13.)  Ms. Moore notes that even persons who are too intoxicated to provide booking information are supposed to be "placed in a padded cell on a 15 minute watch[,]" but this policy was not followed. (*Id.*)  In addition, despite knowing that Plaintiff had been in a car wreck, Nurse Walker did not check Plaintiff for a head injury, check for pupil dilation, or check his vital signs. (*Id.*)

### B.  Defendants' Affidavits

To support summary judgment, Defendants present their own affidavit testimony as to

what they observed on the day Plaintiff was arrested.  Deputy Martinez testifies that based on his training and experience, "Mr. Marquez appeared to be under the influence of drugs and/or alcohol."  (Mot. Ex. A ¶ 5.)  Deputy Martinez states that Plaintiff repeatedly denied having a medical condition.  (*Id.* ¶¶ 6-7, 9, 11.)  However, Deputy Martinez testifies that he "observed [Plaintiff] swaying from side to side, . . . [and] I had to grab on to him, several times, due to the fact that I thought he was going to lose his balance and fall down." (*Id.* ¶ 5.)  Deputy Martinez explains, "due to the fact that Mr. Marquez failed the Standardized Field Sobriety Tests that I administered to him, he was placed under arrest and was read the NM Implied Consent Advisory, from a card that I kept in my front left shirt pocket." (*Id.* ¶¶ 5-8.)  Deputy Martinez testifies that after his arrest, Plaintiff "understood my questions and he advised me that he would take our tests. . . . At no time did I notice that he had a fever." (*Id.* ¶ 8.)

Deputy Jones testifies, "[b]ased on my training and experience, Mr. Marquez appeared to be under the influence of alcohol and/or drugs.  When we [Deputy Martinez and Deputy Jones] made contact with [Plaintiff] he appeared to understand all of our questions and he responded appropriately to all of them."  (Mot. Ex. B ¶ 5.)  Deputy Jones testifies, "[a]t no time during my contact with Mr. Marquez did I observe that he was in need of medical attention.  Further, Mr. Marquez did not request any medical attention.  At no time when I had physical contact with Mr. Marquez did I perceive that he had a fever or elevated body temperature and he was not sweating."  (*Id.* ¶ 7.)

ECDC Corrections Officer Salcido testifies, "[b]ased on my training and experience, Mr. Marquez appeared to be under the influence of drugs and/or alcohol."  (Mot. Ex. C ¶ 4.)  Salcido testifies that during the booking process, Plaintiff, "responded to some questions and would not answer others.  He seemed confused. . . . Due to his failure to respond to all of my questions, I

15

could not complete the booking process and I had him sit in an observation area in booking." (*Id.* ¶ 5.) Salcido describes Plaintiff's deteriorating condition, "[w]hen I attempted to help him change into his detention uniform he had difficulty maintaining his balance. . . . At this time I noticed that Mr. Marquez' ability to walk had deteriorated. I immediately contacted Ms. Walker who came to booking to evaluate Mr. Marquez. Ms. Walker determined that Mr. Marquez had a temperature of 104 degrees. Ms. Walker directed that Mr. Marquez be transported to the Emergency Room. At no time did I observe that Mr. Marquez was in need of medical attention. Further, at no time did Mr. Marquez request medical attention." (*Id.* ¶¶ 6-7.)

Similarly, Nurse Walker testifies, "Mr. Marquez appeared to be under the influence of drugs and/or alcohol." (Mot. Ex. D ¶ 4.) Nurse Walker "spoke to Mr. Marquez. He understood my questions and responded appropriately. Mr. Marquez denied any medical problems and he did not request medical attention." (*Id.* ¶ 4.) "At approximately 1:00 p.m. I was contacted by booking and they requested that I return to evaluate Mr. Marquez. I observed that he had slurred speech and could not focus. I checked his temperature and determined he had a fever of 104 degrees. I immediately had him transported to the emergence room." (*Id.* ¶ 5.) Nurse Walker testifies, "[a]t no time prior to 1:00 p.m. on September 24, 2009, did I observe that Mr. Marquez was in need of medical attention. Further, at no time did Mr. Marquez request any medical attention." (*Id.* ¶ 6.)

Defendants point to Plaintiff's answers to interrogatories, in which Plaintiff stated that on or about September 20, 2009, while working "Plaintiff began to experience symptoms similar to a bad cold or flu. Plaintiff did not learn of his true medical condition until he awoke from a coma." (Mot. Ex. E.) Defendants contend that this answer, along with their affidavit testimony, shows that they did not violate Plaintiff's constitutional right to medical treatment because they

did know about or suspect that Plaintiff was seriously ill.

### C. Conclusion

This is a close case, but the Court will deny Defendants summary judgment on qualified immunity. Plaintiff has presented evidence that he clearly displayed symptoms of a serious medical condition and that Defendants' inaction demonstrated deliberate indifference to Plaintiff's serious medical needs.

#### 1. Deputy Martinez and Deputy Jones Are Not Entitled to Qualified Immunity

Deputy Martinez and Deputy Jones are not entitled to qualified immunity on the Count I § 1983 claims because Plaintiff has shown they were aware that Plaintiff might have had a serious medical condition, but recklessly disregarded that awareness in favor investigating and arresting Plaintiff for DUI. From the dash cam video, several prominent factors combine to show that Deputy Martinez and Deputy Jones recklessly disregarded Plaintiff's medical needs: 1) the Breathalyzer reading of zero, which the DVD shows was performed within five minutes after Plaintiff's truck was stopped; 2) the searches of Plaintiff's truck and of Plaintiff's person which yielded no signs of drug use; 3) Deputy Martinez's offer to call someone to come and pick up Plaintiff; and 4) Deputy Martinez's and Deputy Jones' discussion of medical conditions such as high blood pressure as the cause of Plaintiff's behavior. The evidence further shows that at the medical center the Deputies had Plaintiff's blood drawn but did not ask for a medical evaluation despite having previously discussed the possibility of a medical condition as an explanation for Plaintiff's behavior. According to Plaintiff's expert, Van Blaricom, based on their training the Deputies should have recognized the obvious signs of a medical emergency. Moreover, Dr. Suite testified that had the Deputies sought a medical evaluation of Plaintiff, he

would have received the badly needed treatment that would have prevented his permanent brain injury.

Plaintiff's evidence demonstrates that Deputy Martinez and Deputy Jones were also recklessly indifferent to Plaintiff's medical needs when they misrepresented to the ECDC intake officers and to Nurse Walker that Plaintiff was coming off of some sort of drug, instead of telling the ECDC personnel more specifically that Plaintiff registered zero on the Breathalyzer, that they had not seen any obvious signs of drug use, and that they had discussed the possibility that Plaintiff had a medical condition.  From this evidence, especially the DVD recording of the traffic stop and the expert opinions, a jury could find that the Deputies were aware of the risk that Plaintiff had a serious medical condition but were deliberately indifferent to that risk. Hence, the Court concludes that Plaintiff has met his burden to come forward with evidence from which a jury could find that Deputy Martinez and Deputy Jones violated Plaintiff's right to adequate medical care under the Fourteenth Amendment.

### 2.  ECDC Employees Nurse Walker, Salcido, and Danette Martinez Are Not Entitled to Qualified Immunity

The deliberate indifference test requires a plaintiff to "show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Stafford v. Stewart*, 461 Fed. App'x. 767, 769-70 (10th Cir. 2012) (citing *Martinez v. Beggs*, 563 F.3d at 1089)).  "The factfinder may conclude that a prison official subjectively knew of the substantial risk of harm by circumstantial evidence or from the very fact that the risk was obvious." *Id.*  "[T]he symptoms displayed by the prisoner are relevant to the subjective component of deliberate indifference. The question is: 'were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?'" *Id.* (quoting,

*Martinez*, 563 F.3d at 1089 (quoting *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005)).

Plaintiff presented evidence that at ECDC employees Salcido and Danette Martinez observed that Plaintiff could not communicate, could not stand, could not focus, could not answer basic questions, and had to be held up to be photographed during the booking process. In addition, despite these obvious symptoms of a medical condition, Nurse Walker, Salcido, and Danette Martinez violated ECDC policy by failing to screen Plaintiff for a medical condition prior to accepting Plaintiff into custody and acted on the Deputies' opinion that Plaintiff was coming off of some sort of drug. Instead of performing the required screening, which would have included taking Plaintiff's vital signs, Nurse Walker told Officers Salcido and Danette Martinez to watch Plaintiff and to call her if Plaintiff "got worse." Plaintiff's expert Ms. Moore opined that Officers Salcido, Danette Martinez, and Nurse Walker violated ECDC policy that requires immediate medical attention at a hospital for "persons who are . . . mentally unstable, or otherwise urgently in need of medical attention." According to Ms. Moore, ". . . it was evident that Mr. Marquez needed medical attention due to his inability to maintain his balance and inability to focus." Despite observing Plaintiff's deteriorating physical and mental condition, neither Salcido nor Danette Martinez called for medical help until 1:00 pm, two and one half hours after Plaintiff had been brought to ECDC.

Notably, the evidence shows that Plaintiff denied having a medical condition and did not ask for medical help at any time during his detention. And, Defendants have presented affidavit testimony that based on their training and experience, Plaintiff appeared to be intoxicated by alcohol or drugs. However, according to Plaintiff's law enforcement expert, Van Blaricom, Defendants are also trained to recognize medical emergencies, when there is no accompanying physical evidence of alcohol and/or drug intoxication. The Deputies witnessed obvious signs of

19

Plaintiff's altered mental state along with the Breathalyzer reading of zero.  These signs provided a clear basis on which to conclude that Plaintiff needed a medical evaluation that could have been performed in addition to a blood draw.  At the ECDC, Plaintiff exhibited symptoms of a deteriorating mental and physical condition that should have alerted ECDC personnel to his need for medical evaluation and treatment, but no required evaluation was done prior to accepting Plaintiff into custody.  The simple act of taking Plaintiff's vital signs revealed the devastating results of the delay in getting treatment: a fever of 104 degrees accompanied by possible brain seizures, according to Dr. Suite.  In performing a qualified immunity analysis, this Court does not expect law enforcement and correctional officers to make medical diagnoses or determine the need for specific medical treatment, however; this Court cannot grant summary judgment on qualified immunity in light of evidence that these Defendants recklessly disregarded several obvious signs that Plaintiff needed medical attention.

IT IS ORDERED that DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. No. 41) is denied.

*James A. Parker*
SENIOR UNITED STATES DISTRICT JUDGE