**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**IRVING J. MARQUEZ,**

      Plaintiff,

v.                                 No. CIV 11-838 JAP/KBM

**BOARD OF COUNTY COMMISSIONERS OF
EDDY COUNTY, VICTOR E. MARTINEZ JR.,
DARREN JONES, RUTH ANN WALKER,
SAL REY SALCIDO,** and **DANETTE MARTINEZ,**

      Defendants.

**MEMORANDUM OPINION AND ORDER**

On March 2, 2015, Defendants filed DEFENDANTS' MOTION FOR SUMMARY

JUDGMENT REGARDING PLAINTIFF'S INABILITY TO PROVE DAMAGES (Doc. No.

141) (Motion for Summary Judgment)[1] and DEFENDANTS' MOTION FOR SUMMARY

JUDGMENT ON PLAINTIFF'S FIRST AMENDED COMPLAINT AND FOR QUALIFIED

IMMUNITY AND MEMORANDUM IN SUPPORT THEREOF (Doc. No. 142) (Motion for

Qualified Immunity).[2]

Defendant has filed four related motions to exclude the opinion testimony of four of

Plaintiff's expert witnesses. The witnesses Defendants seek to exclude fall into three categories:

(1) Plaintiff's experts on liability, (2) Plaintiff's expert on causation, and (3) Plaintiff's expert on

damages. As to Plaintiff's expert witnesses on the question of liability, Defendants have filed

two motions: (1) a MOTION TO STRIKE THE EXPERT REPORT OF JACQUELINE R.

MOORE, RN, Ph.D., AND MEMORANDUM IN SUPPORT THEREOF (Motion to Strike

---

[1] On April 6, 2015, Plaintiff filed a RESPONSE IN OPPOSITION (Doc. No. 152) (Response). On April 23, 2015, Defendant filed a REPLY (Doc. No. 165).
[2] On April 6, 2015, Plaintiff filed a RESPONSE IN OPPOSITION (Doc. No. 153) (Response). On April 23, 2015, Defendant filed a REPLY (Doc. No. 163).

Moore) (Doc. No. 136),[3] and (2) MOTION TO STRIKE THE EXPERT REPORT OF DONALD

P. VAN BLARICOM, AND MEMORANDUM IN SUPPORT THEREOF (Motion to Strike

Van Blaricom) (Doc. No. 139).[4]

Defendants' MOTION TO STRIKE THE EXPERT REPORT OF NICHOLAS SUITE,

M.D., AND MEMORANDUM IN SUPPORT THEREOF (Doc. No. 140) (Motion to Strike

Suite) seeks to exclude Plaintiff's expert on causation.[5] Defendants' DEFENDANTS' MOTION

TO STRIKE THE EXPERT REPORT OF GILBERT MARTINEZ PH.D. AND

MEMORANDUM IN SUPPORT THEREOF (Doc. No. 137) (Motion to Strike Martinez) seeks

to exclude Plaintiff's damages expert.[6]

For the following reasons, the Court will grant in part and deny in part Defendants'

Motion to Strike Van Blaricom, Motion to Strike Moore, and Motion to Strike Suite. The Court

will deny Defendants' Motion to Strike Martinez. Since Dr. Suite and Martinez's opinions (as

well as other evidence in the record) suffice to establish triable issues of fact on Plaintiff's

claims, the Court will deny Defendants' Motion for Summary Judgment. Defendants' Motion for

Qualified Immunity is to a large extent a motion to reconsider this Court's earlier denial of

Defendants' motion for summary judgment on qualified immunity grounds. Because the record

still contains genuine issues of material fact that may only be resolved by a jury, the Court will

deny Defendants' Motion for Qualified Immunity. The Court will grant the Motion for Qualified

Immunity as to some of Plaintiff's claims under state law, however.

---

[3] On April 1, 2015, Plaintiff filed a RESPONSE (Doc. No. 147). On April 13, 2015, Defendants filed a REPLY
(Doc. No. 155).
[4] On April 3, 2015, Plaintiff filed a RESPONSE (Doc. No. 149). On April 16, 2015, Defendants filed a REPLY
(Doc. No. 156).
[5] On April 3, 2015, Plaintiff filed a RESPONSE (Doc. No. 151). On April 16, 2015, Defendants filed a REPLY
(Doc. No. 158).
[6] On April 3, 2015, Plaintiff filed a RESPONSE (Doc. No. 150). On April 16, 2015, Defendants filed a REPLY
(Doc. No. 157).

## I.      Background

### A.      Plaintiff's arrest and hospitalization

This Court has already detailed the undisputed facts underlying this action in an earlier MEMORANDUM OPINION AND ORDER (Doc. No. 62) denying Defendants' MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. No. 41). What follows is an abbreviated recitation of the undisputed facts and procedural history of this case relevant to the motions now before the Court.

At around 7 A.M. on September 24, 2009, Defendant Deputy Victor Martinez observed Plaintiff's vehicle cross the middle line of the road and narrowly avoid colliding head-on with a semi tractor-trailer. Deputy Martinez activated his warning lights, and as Deputy Martinez pulled up behind Plaintiff's truck, Plaintiff pulled off on to the right shoulder of the road and collided with a guardrail. Plaintiff backed up a few feet and then drove into the guardrail again. Plaintiff staggered out of his truck and was unable to maintain his balance.

At some point Defendant Deputy Darren Jones arrived on the scene, and the officers tried to ascertain the cause of Plaintiff's incapacitation. The two deputies' first hunch was that Plaintiff was drunk. So the Deputies got Plaintiff to breathe into a portable Intoxilyzer. The device indicated that Plaintiff had a blood alcohol content (BAC) reading of 0.00. But Plaintiff failed a standardized field sobriety test: he could not walk in a straight line, balance on one foot, or follow Deputy Martinez's finger movements. *See* Doc. No. 62 at 4–5.

Unbeknownst to the officers and Plaintiff, Plaintiff had contracted West Nile Virus from a mosquito bite several days earlier. Plaintiff's West Nile Virus was causing viral encephalitis (that is, acute swelling of the brain), and this in turn was causing Plaintiff's erratic behavior. Unfortunately for Plaintiff, blowing a 0.00 BAC only eliminated alcohol as a hypothetical cause

of Plaintiff's incapacity, not other narcotic drugs. To be sure, the deputies did not immediately

rule out the possibility of a medical condition causing Plaintiff's behavior—the deputies asked

Plaintiff whether he was suffering from a condition, and Plaintiff confessed that he was sick and

had taken NyQuil. And there was no evidence that Plaintiff's behavior was caused by either

alcohol or drugs: the deputies searched his vehicle and found nothing of note. But Plaintiff

denied having any kind of medical emergency, so the deputies essentially remained on square

one.

Whatever caused Plaintiff's ailments, the deputies knew Plaintiff could not be allowed to

continue on his way. So the deputies arrested Plaintiff for driving under the influence of alcohol

or drugs and took him to a hospital to have his blood tested. At the hospital, the deputies could

have killed two birds with one stone—i.e., disproved the hypothesis that Plaintiff was on drugs

and proved the hypothesis that he was suffering from a medical condition—by having him

evaluated at the same time that his blood was drawn. But that did not happen; once Plaintiff's

blood was drawn, the deputies took him to the Eddy County Sheriff's office and from there to the

Eddy County Detention Center (ECDC) to be booked and held in detention.

Plaintiff's symptoms worsened at ECDC. Plaintiff could not stand on his own and slurred

his words during the booking process. Although the deputies told ECDC staff that Plaintiff was

suffering from "DWI or possible drugs," Defendant Salcido, noting Plaintiff's condition, asked

that Plaintiff be medically evaluated before he was booked. Defendant Walker, the on-call nurse

at ECDC, did not measure Plaintiff's vital signs, trusting the deputies' representations that

Plaintiff was simply under the influence of alcohol or other narcotics. Nurse Walker gave the

okay to book Plaintiff. Nurse Walker's only instruction to staff was that Plaintiff should be

monitored to see if his condition improved or worsened.

4

Plaintiff's condition continued to deteriorate. Eventually, Nurse Walker returned, and she finally took Plaintiff's vital signs. Crucially, Nurse Walker discovered that Plaintiff was suffering from a 104° fever. Nurse Walker had Plaintiff immediately removed from detention and taken to the emergency room. From the time of Plaintiff's arrest—8:26 a.m.—to the time he was admitted to the Carlsbad Medical Center (CMC)—1:33 p.m.—approximately 5 hours and 7 minutes had passed.

CMC records show Plaintiff reported that he was not in any pain. Notes indicate that Plaintiff "was oriented to person and place," and his "speech was normal." Motion for Summary Judgment at 7 (citing Carlsbad Medical Center Records (Doc. No. 141-7) at 1). Nonetheless, Plaintiff's "level of consciousness [was] altered…." Doc. No. 141-7 at 1. Plaintiff was given intravenous antibiotics and steroids, but was not administered any antiseizure medications. Doc. No. 141-7 at 1; Response at 6. At 3:45 p.m., Plaintiff was given a spinal tap which revealed abnormal pressure on Plaintiff's brain. Doc. No. 141-7 at 3.

On September 25, 2009, the day after his arrest, Plaintiff was transferred to the Lovelace Medical Center in Albuquerque, New Mexico. Doc. No. 141-8. Lovelace diagnosed Plaintiff with West Nile Virus. Doc. No. 141-9 at 1. Lovelace doctors began administering Plaintiff with fosphenytoin, an anticonvulsant or "anti-seizure" medication. *Id.* Over the next several days, doctors noted a "gradual improvement" in Plaintiff's condition, enough at least to discontinue steroid and anti-seizure medications. *Id.* at 2.

On October 9, 2009, Plaintiff's mother arranged for Plaintiff to be discharged from Lovelace. *Id.* Although doctors believed Plaintiff should have been placed in rehabilitation, they concluded that Plaintiff's supportive family environment and his mother's training and experience as a nurse made discharge a viable option. *Id.* Plaintiff was released into his mother's

custody and was prescribed sinemet (a treatment for the symptoms of Parkinson's disease, i.e., shaking, stiffness, and slow movement) and temazepam (a sleeping pill). *Id.*

Despite the Lovelace doctors' express instruction to Plaintiff that he "not…drive a car or operate machinery[,]" Doc. No. 141-9 at 2, Plaintiff drove his mother's car from the hospital toward El Paso. Doc. No. 141-10 at 2. At some point during the trip, Plaintiff's fever returned, and he began convulsing. Plaintiff's mother called an ambulance, and Plaintiff was taken to the Providence Memorial Hospital in El Paso, Texas. Doc. No. 141-11 at 1. The hospital administered Ativan, an anti-seizure medication. *Id.* Plaintiff spent the next month in the hospital. Doc. No. 141-12 at 3–4. On November 9, 2014, Plaintiff was transferred to a rehabilitation facility. *Id.* at 4.

 B.  Plaintiff's First Amended Complaint (Doc. No. 20)

In Count I of his FIRST AMENDED COMPLAINT TO RECOVER DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS AND STATE TORT CLAIMS (Doc. No. 20) (Amended Complaint), Plaintiff asserts a claim against Deputy Martinez and Deputy Jones under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment alleging that from the time Plaintiff was stopped to the time that Plaintiff was dropped off at ECDC intake, Deputy Martinez and Deputy Jones deprived Plaintiff of access to medical care and were deliberately indifferent to the obvious signs that Plaintiff had a serious medical problem. Plaintiff contends that instead of administering field sobriety tests, Deputy Martinez and Deputy Jones should have requested emergency medical services for Plaintiff immediately, but instead, the Deputies actively deprived Plaintiff of access to medical care both at the scene of the traffic stop and at the Carlsbad Medical Center. Plaintiff further alleges that the failure to obtain medical services for him caused him serious permanent injury.

In Count II, Plaintiff asserts a claim against Nurse Walker, Salcido and Danette Martinez under 42 U.S.C. § 1983 alleging that these Defendants violated Plaintiff's Fourteenth Amendment right to adequate medical care. Plaintiff contends that these Defendants should have turned Plaintiff away at ECDC intake which would have required the arresting officers to take Plaintiff back to the Carlsbad Medical Center for a medical evaluation. Plaintiff alleges that these Defendants booked Plaintiff into ECDC custody without performing the required medical screening. Plaintiff maintains that by accepting Plaintiff into custody and delaying a medical screening, these Defendants caused Plaintiff permanent injury.

In Count III, Plaintiff asserts a state law claim against Nurse Walker for professional negligence. In Count IV, Plaintiff asserts several state law claims under the New Mexico Tort Claims Act (NMSA 1978 §§ 41-4-1 *et seq.*) against Deputy Martinez, Deputy Jones, Nurse Walker, Salcido, and Danette Martinez for personal injury from 1) the deprivation of constitutional rights by law enforcement officers under the NMTCA (false imprisonment); 2) the negligent operation of a medical facility; 3) the negligent provision of health care services; and 4) the negligent maintenance of a public building. *See* NMSA 1978 §§ 41-4-6, 41-4-9, 41-4-10, 41-4-12.

    C.    <u>Defendants' first motion for summary judgment and proceedings before the Tenth Circuit Court of Appeals</u>

On June 15, 2012, Defendants asked the Court to enter summary judgment on Plaintiff's claims under 42 U.S.C. § 1983. *See* DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. No. 41). Defendants argued that they were entitled to summary judgment on Counts I and II of Plaintiff's complaint under the doctrine of qualified immunity because Plaintiff had failed to produce any evidence that Defendants were "deliberately indifferent, as

opposed to merely negligent, in their failure to recognize Plaintiff's severe illness." *See* MEMORANDUM OPINION AND ORDER (Doc. No. 62) at 11. The motion for summary judgment was in large part supported by Defendants' affidavit testimony that Plaintiff's medical condition had gone unnoticed for the duration of his time in Defendants' custody. *See id.* n.5.

The Court denied the motion, finding that "Plaintiff [had] presented evidence that he clearly displayed symptoms of a serious medical condition and that Defendants' inaction demonstrated deliberate indifference to Plaintiff's serious medical needs." *Id.* at 17. The Court's conclusion was based on the following evidence. First, as to Defendants Martinez and Jones, the Court found that a fact issue existed as to their deliberate indifference because they ignored strong circumstantial evidence that Plaintiff was not drunk or under the influence of narcotics: the Intoxilyzer reading of 0.00, the absence of any drug paraphernalia in Plaintiff's truck, Defendant Martinez's offer to call someone to pick up Plaintiff, and Defendants Martinez and Jones' contemporaneous statements that Plaintiff's behavior could be caused by some kind of medical condition.[7]

The Court also denied the Defendants' motion for summary judgment as to Defendants Walker, Salcido, and Danette Martinez. The Court concluded that evidence in the record created issues of fact as to whether Defendants Walker, Salcido, and Danette Martinez had deliberately or recklessly ignored Plaintiff's obvious medical condition. The Court rested its conclusion on these Defendants' failure to "screen Plaintiff for a medical condition prior to accepting [him] into custody" and uncritically accepting Defendants Martinez and Jones' representation that Plaintiff was under the influence of narcotics. *Id.* at 19.

---

[7] The Court noted that there was other evidence in the record that could support a jury's finding that Defendants Martinez and Jones had been deliberately indifferent to Plaintiff's constitutional rights by "misrepresent[ing] to the ECDC intake officers and to Nurse Walker that Plaintiff was coming off some sort of drug" and not disclosing the evidence they found that undermined this conclusion. Memorandum Opinion and Order (Doc. No. 62) at 18.

The Court found it notable that "Plaintiff denied having a medical condition and did not ask for medical help at any time during his detention." *Id.* The Court commented that it would be reasonable or even plausible that Defendants ignored Plaintiff's medical condition not because of any reckless or deliberate conduct, but rather because of Plaintiff's steadfast denials that he was suffering from any kind of medical condition and because Plaintiff's symptoms were essentially indistinguishable from alcohol or narcotic intoxication. *Id.* at 19–20. But ultimately the Court found that the evidence supported a contrary inference, and that summary judgment was therefore improper. *Id.* at 20.

Defendants appealed the Court's denial of their motion for summary judgment to the Tenth Circuit Court of Appeals. The Tenth Circuit affirmed this Court's determination that fact issues precluded entry of summary judgment in Defendants' favor on qualified immunity grounds. *See* ORDER AND JUDGMENT (Doc. No. 72-1).

## II.     Legal Standards

### A.     <u>Standard for motions to exclude the testimony of an expert witness</u>

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> 
> (a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> 
> (b)     the testimony is based upon sufficient facts or data;
> 
> (c)     the testimony is the product of reliable principles and methods; and
> 
> (d)     the expert has reliably applied the principles and methods to the facts of the case.

Fed R. Evid. 702. Rule 702 codifies the principles governing the admissibility of expert testimony set out in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993) and *Kumho Tire Co.*

*Ltd. v. Carmichael*, 526 U.S. 137 (1999). *See* Fed. R. Evid. 702 advisory committee cmt. (2000 amendments).

In considering whether an expert opinion is admissible, the district court performs a two-step analysis: (1) the court first determines whether the expert is qualified by knowledge, skill, experience, training or education to render an opinion; and (2) if the expert is so qualified, the court decides whether the expert's opinion is reliable and helpful under *Daubert*. *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).

Under *Daubert*, courts measure reliability of scientific evidence by considering the following non-exhaustive list of factors: (1) whether the expert's technique or theory can be and has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the general acceptance of the methodology in the relevant scientific community. *Kumho Tire*, 506 U.S. at 149–50; *103 Investors*, 470 F.3d at 990 (citing *Daubert*, 509 U.S. at 593–94). The *Daubert* Court emphasized that the district court's focus must be solely on the expert's principles and methodology, not the expert's conclusions.

Trial courts have broad discretion in determining the admissibility of expert testimony. *United States v. Valarde*, 214 F.3d 1204, 1208 (10th Cir. 2000). Trial courts have equally broad discretion in determining how to assess an expert's reliability, including which procedures to use in making that assessment. *Id.* at 1208–09. The district court, however, has no discretion as to whether it may or may not perform the gate-keeping function. *Turner*, 285 F.3d at 913.

B.   Standard for evaluating a motion for summary judgment under Fed. R. Civ. P. 56

Under the Federal Rules of Civil Procedure, summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." FED. R. CIV. P. 56(a). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The party seeking summary judgment bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation marks omitted). Once the movant meets this burden, Rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In considering a motion for summary judgment, then, the Court's "role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim." *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1195 (10th Cir. 2002).

The parties agree that in order for Plaintiff to obtain relief for his claim under the Fourteenth Amendment, Plaintiff must first show that Defendants denied Plaintiff access to adequate medical care. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). Such a violation must be established by evidence that Defendants were deliberately indifferent to Plaintiff's serious medical needs. *Id.* "Deliberate indifference" is established by proving two facts. First, Plaintiff must prove that the harm he suffered as a result of the denial of medical treatment was objectively "sufficiently serious" to amount to "cruel and unusual punishment" under the Eighth Amendment. *Id.* Next, Plaintiff must establish that that Defendants knew

Plaintiff "faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Id.* at 1089 (citation omitted).[8]

      C.      <u>Standard for granting summary judgment on the basis of qualified immunity</u>

When a defendant raises the defense of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. See *Tolan v. Cotton*, —— U.S. ——, 134 S.Ct. 1861, 1865, 188 L.Ed.2d 895 (2014) (per curiam). "The first [prong] asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." *Id.* (alterations omitted). "The second prong…asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 1866. "[U]nder either prong" of the qualified immunity inquiry, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *See id.*

      D.      <u>Standard for creating a triable issue of causation</u>

Section 1983 only imposes liability on a defendant who "subjects, or causes to be subjected, any citizen…or other person…to the deprivation of any rights" under federal law. This provision has been read to require a § 1983 plaintiff to prove that the defendant's conduct was the "proximate cause" of Plaintiff's injuries. *See Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989) (citing *Martinez v. California*, 444 U.S. 277, 285 (1980)); *see also* 1A Martin A. Schwartz et al., SECTION 1983 LITIGATION: CLAIMS AND DEFENSES § 6.03[A] (Aspen 2011). "Most courts have found that proximate cause under § 1983 incorporates common-law tort causation principles." Schwartz, *supra* at § 6.03[A]; *id.* n.37 (citing cases).

---

[8] Through the due process clause of the Fourteenth Amendment, persons who are arrested or detained are protected against the denial of adequate medical attention. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).

Under New Mexico law,

> [a]n act or omission is a "cause" of injury if, unbroken by an independent intervening cause, it contributes to bringing about the injury, and if injury would not have occurred without it. It need not be the only explanation for the injury, nor the reason that is nearest in time or place. It is sufficient if it occurs in combination with some other cause to produce the result. To be a "cause", the act or omission, nonetheless, must be reasonably connected as a significant link to the injury or harm.

Rule 13-305 NMRA. An independent intervening cause "interrupts and turns aside a course of events and produces that which was not foreseeable as a result of an earlier act or omission." Rule 13-306 NMRA.

E.  Standard for submitting an issue of damages for determination by a jury

A jury may not award damages based on speculation; in other words, there must be evidence in the record that can allow the factfinder to assess damages to a reasonable degree of certainty. *Hebenstreit v. Atchison, T. & S.F. Ry.*, 65 N.M. 301, 306, 336 P.2d 1057, 1061 (N.M. 1959); *Sanchez v. Martinez*, 99 N.M. 66, 72, 653 P.2d 897, 902 (N.M. Ct. App. 1982). A jury may proceed to determine the amount of damages suffered by a plaintiff only after determining that the defendant is liable (i.e., caused) plaintiff's claimed harms. *See* Rule 13-1801 NMRA ("You [the jurors] are not to engage in any discussion of damages unless you have first determined that there is liability….").

F.  Standard for assessing punitive damages under 42 U.S.C. § 1983

If a defendant deliberately or maliciously subjects a plaintiff to a deprivation of the plaintiff's rights, then the jury may award punitive damages in order to deter future misconduct by the official and others similarly situated. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 267 (1981). Punitive damages may not be imposed on municipalities, because the municipal

entity is incapable of forming the requisite mental state of intent that is a prerequisite to the assessment of punitive damages. *Id.* at 268.

## III.   Discussion

Plaintiff has named four expert witnesses to testify on his behalf at trial: Donald Van Blaricom ("Van Blaricom"), Jacqueline Moore, RN, Ph.D. ("Moore"), Nicholas Suite, M.D. ("Dr. Suite"), and Gilbert Martinez, Ph.D ("Martinez"). Van Blaricom offers an opinion that Defendants Martinez and Jones would have obtained a medical evaluation for Plaintiff had they applied generally-accepted police practices to the situation they faced after stopping Plaintiff. Nurse Moore offers a corresponding opinion as to Nurse Walker. Dr. Suite opines that the delay in obtaining necessary medical treatment for Plaintiff because of Defendants' conduct was a substantial cause of Plaintiff's injuries. Finally, Martinez opines about the extent of the damages Plaintiff suffered as a result.

In the Motion for Qualified Immunity, Defendants contend that they are entitled to summary judgment because there is no evidence in the record to support a jury's finding that Defendants were deliberately indifferent to Plaintiff's medical emergency.[9] Defendants' contention that there is no genuine dispute over any material fact partially follows from Defendants' arguments that this Court should exclude the testimony of Van Blaricom and Nurse Moore. Accordingly, the Court will address Defendants' Motion to Strike Van Blaricom and Motion to Strike Moore before addressing Defendants' Motion for Qualified Immunity.

Because the Court will deny Plaintiff's Motion for Qualified Immunity, the Court will next address Defendants' contention that even if there is a triable issue of fact as to Defendants' violation of Plaintiff's constitutional rights, there is no genuine dispute that Defendants' conduct

---

[9] In the Motion for Qualified Immunity, Defendants also argue that they are entitled to summary judgment on Plaintiff's claims under the New Mexico Tort Claims Act.

was neither the actual nor the proximate cause of Plaintiff's damages. This argument is in large part, if not entirely, based on Defendants' argument that the Court should exclude from the record the expert opinion of Dr. Suite. *See* Motion for Summary Judgment at 11. The Court will therefore address the Motion to Strike Suite before the Motion for Summary Judgment as to causation.

Because the Court will deny Defendants' Motion to Strike Suite with respect to Dr. Suite's testimony on causation, the Court will proceed to address Defendants' argument that Plaintiff cannot prove his damages without inviting the jury to engage in impermissible speculation. *See* Motion for Summary Judgment at 16. This conclusion is at least in part premised on Defendants' assertion that the opinion of Plaintiff's expert on damages, Martinez, should be excluded. *Id.* Accordingly, the Court will address Defendants' Motion to Strike Martinez before proceeding to Defendants' arguments as to damages.

Finally, Defendants contend there is no evidence in the record that Defendants engaged in "outrageous" conduct, a prerequisite to any award of punitive damages. *Id.* at 17. Accordingly, Defendants contend that they are entitled to summary judgment at the very least on Plaintiff's claims for punitive damages.

A.     Plaintiff's expert Van Blaricom and Defendants' Motion to Strike Van Blaricom

i.     Van Blaricom's qualifications and opinions

1.     Van Blaricom's qualifications

Van Blaricom has "[t]wenty-nine years of continuous police service," the last eleven of which he spent as the Chief of Police of Bellevue, Washington. Doc. No. 139-1. For the 26 years following his retirement as Chief of Police of Bellevue, Van Blaricom has been a "police practices consultant." *Id.* Van Blaricom's experience as a police officer included "detain[ing] and

investigat[ing] suspected alcohol and/or drug impaired drivers[,]…conduct[ing] internal investigations[,]…train[ing] police officers on patrol procedures[,]…[and] evaluat[ing] the performance of my subordinate police officers….” Doc. No. 139-2 at 2. As the Chief of Police for the City of Bellevue, Van Blaricom “develop[ed] and administer[ed] policies and procedures for directing police officers under [his] command[,]…[and] review[ed] internal investigations and [made] the final administrative decision on whether to sustain or not sustain allegations of misconduct….” *Id.* Finally, as a “police practices expert,” Van Blaricom regularly reviews “recognized [sources of] professional standards of care: (1) State and federal appellate court decisions, [and] National Law Enforcement Policy Center model policies and similar publications….” *Id.* at 3.

       2.     <u>Van Blaricom’s expert reports</u>

      Van Blaricom wrote a “preliminary” expert report (Doc. No. 139-1) on June 7, 2012. That report proceeds in the following manner. First, Van Blaricom makes assumptions of fact based on his analysis of the evidence in the record. Doc. No. 139-1 at 3–4. Van Blaricom assumes the following facts:[10]

        a.     Arresting deputies were dispatched to a report of a possibly impaired driver at approximately 7:49 AM;
        b.     Arresting deputies stopped and detained Plaintiff at approximately 8:04 AM;
        c.     Arresting deputies immediately made the following observations of Plaintiff: (1) As he was pulling over in response to being signaled to stop, plaintiff “struck a guardrail head on, backed up a few feet, then went forward and struck the guardrail again; (2) Plaintiff was swaying from side to side, while he was walking and had to be grabbed several times to prevent him from falling down.
        d.     Plaintiff denied having consumed alcohol or taking any drugs except for NyQuil;

---

[10] The Court has changed (and does not note) the punctuation and format in the following quotations from Van Blaricom’s report.

e.      Plaintiff submitted to a portable Intoxylizer and registered a 0.00;

f.      Plaintiff was unable to complete standardized field sobriety tests;

g.      The video/audio recording of the stop is illustrative: (1) Arresting Deputy Martinez obviously doubted that plaintiff's physical condition was alcohol and/or drug induced, as he is specifically heard to tell Plaintiff, "If you're not under the influence and you're driving like that, something's wrong," and "what it is, I don't know," and (2) Although as many as five deputies are on the scene, only arresting deputies appear to be communicating with Plaintiff;

h.      Arresting deputies transported plaintiff to Carlsbad Medical Center but only for a blood draw and not for a medical examination (that blood draw ultimately proved negative for both alcohol and drugs);

i.      Arresting deputies next transported Plaintiff to ECDC, where he was accepted and booked into jail custody;

j.      Booking Officer Sal Salcido was immediately "concerned about him" (Plaintiff) and observed: (1) Plaintiff was struggling to maintain balance," and (2) Accordingly, Salcido "immediately called for Nurse Ruth Walker," and she approved plaintiff "clear to receive as inmate," and told Booking Officer Salcido, "If he got worse to call her,"

k.      Nurse Walker's notes described her involvement with plaintiff: (1) She first saw him at 10:30 AM: (a) He had been previously sent to the hospital for blood work only; (b) She relied on the arresting officers' report that Plaintiff was "coming off of some narcotic or drug;" (c) She "will monitor" (but did not); (d) She does not indicate having taken Plaintiff's vital signs. (2) Nurse Walker next saw Plaintiff at 1:00 PM, after Detention Officer Salcido had become even further concerned with Plaintiff's condition….Nurse Walker finally took Plaintiff's vital signs and found his temperature to be 104 [degrees].

l.      Plaintiff was transported to the CMC Emergency Room (ER) at 1:33 PM;

m.      …Acting Jail Warden Shawn Funk…questioned "why we had excepted (sic) [Plaintiff] into the facility if there was a question as to his medical well being?"

n.      Plaintiff had been in-custody of ECSO from 8:04 AM to 1:33 PM, or a total of 5 hours 29 minutes, without receiving emergency medical attention;

o.      after receiving the necessary emergency medical attention, Plaintiff was diagnosed with advanced symptoms of West Nile Virus.

Doc. No. 139-1 at 4–5.

Van Blaricom's report states that in situations where a police officer is "confronted with a medical unknown," the best practice is to "always 'err on the side of caution.'" Doc. No. 139-1 at 6. Van Blaricom opines that Defendants Martinez and Jones should have had Plaintiff medically evaluated when they took him to the hospital for a blood draw. *Id.* at 5. Next, Van Blaricom's report states that Defendants Walker, Salcido, and Danette Martinez failed to 'err on the side of caution' when they accepted Plaintiff into ECDC without requiring a hospital medical clearance. *Id.* at 6.

Van Blaricom's final expert report (Doc. Nos. 139-2 and 139-3) essentially restates the above conclusions, but includes statements from the depositions of Defendant Salcido, Danette Martinez, and Jones. The final report also offers a "rebuttal" to Defendants' own police practices expert, John Ryan. Doc. No. 139-3 at 3. Van Blaricom attacks Mr. Ryan's qualifications, and then summarizes and responds to Mr. Ryan's opinions. Van Blaricom does not dispute Mr. Ryan's first opinion that Defendants Martinez and Jones' "traffic stop [itself] was consistent with generally accepted policies, practices, training and legal mandates," but argues that "that was never an issue in this litigation." Doc. No. 139-3 at 3. Next, Van Blaricom contends that Mr. Ryan's opinion that Defendants Martinez and Jones' decision to only obtain a blood draw and not a medical evaluation for Plaintiff was "consistent with generally accepted [police] policies, practices, training and legal mandates" ignores evidence that Deputy Martinez suspected Plaintiff was having a medical emergency and that the hospital where the arresting deputies took Plaintiff to have a blood draw was the same hospital where he first obtained treatment. *Id.*

The final report disputes Mr. Ryan's conclusion that "the handling and booking of Plaintiff…was consistent with generally accepted policies, practices, training and legal mandates" and that "there was no deficiency with respect to the medical care" provided to

Plaintiff. *Id.* Van Blaricom contends that this conclusion ignores the lack of objective evidence of drug or alcohol intoxication, Jail Warden Funk's apparent admission of fault, and the fact that neither Mr. Ryan nor Van Blaricom are "qualified" to opine about the adequacy of medical care provided to Plaintiff at ECDC. *Id.*

Van Blaricom next asserts that Mr. Ryan is not qualified to opine on whether Defendant Walker's conduct was consistent with "generally accepted policies, practices, training and legal mandates" because he has no experience with the provision of medical care at prisons. Finally, Van Blaricom says that he has no opinion on Mr. Ryan's conclusions that there is no "policy, custom, training disciplinary or supervisory deficiency" or "any deficiency in hiring, training, supervision, or ratification of misconduct" revealed by the evidence in this case. *Id.* at 139-3 at 4.[11]

### 3.    Van Blaricom's deposition testimony

At his deposition, Van Blaricom testified about his qualifications and expert report. Van Blaricom testified that he had "very [little]" experience conducting traffic stops for somebody under the influence of a drug. Doc. No. 139-4 at 3. He also admitted that he had not drafted any policies for any law enforcement agency since 1985. *Id.* at 4. He further admitted that he had no experience with detention centers; his only experience with detaining individuals was with "holding cells for any prisoners that we booked in. But we only kept them there temporarily." *Id.* Van Blaricom further admitted that he could not recall any law enforcement agency that had a policy of taking individuals for a medical screening when there is no evidence of drug use but the individual is clearly intoxicated. *Id.* at 5. Van Blaricom also conceded that he "wouldn't be surprised" if more than fifty percent of individuals booked into pretrial detention were under the

---

[11] Van Blaricom states that "'ratification of misconduct' remains an open question…." Doc. No. 139-3 at 4.

influence of drugs or alcohol at the time of booking. *Id.* at 6. Finally, Van Blaricom agreed that

whenever an arrestee is under the influence of drugs or alcohol and not in reasonable need of

medical care, there is no obligation to have the arrestee medically evaluated. *Id.* at 7–8.

Turning to his opinions in this case, Van Blaricom conceded that he "couldn't tell

[Plaintiff] was ill from [looking at] the video" of Plaintiff's arrest. *Id.* at 9. He also conceded that

Defendants "did [actually] believe" Plaintiff was under the influence of drugs at the time of his

arrest. *Id.* at 12.

ii.   Defendants' argument for excluding Van Blaricom's testimony

In Defendants' Motion to Strike Van Blaricom, Defendants argue that Van Blaricom is

not qualified to offer an opinion on whether Defendants Jones and Martinez had a duty to

recognize a medical emergency and that they breached this duty with respect to Plaintiff.

Defendants' conclusion that Van Blaricom is not qualified is based on the following facts: (1)

Van Blaricom retired from his career in law enforcement more than 30 years ago; (2) Van

Blaricom has little experience with conducting traffic stops as a police deputy; and (3) Van

Blaricom has no experience with running a detention center. Motion to Strike at 4.

The Court finds that the first two facts do not render Van Blaricom unqualified to offer an

opinion as to the propriety of Defendants Martinez and Jones' conduct and decision not to obtain

a medical evaluation for Plaintiff. While Van Blaricom retired from active police service several

decades ago, he has stayed abreast of developments in the field of police practices. Moreover,

Defendants downplay Van Blaricom's experience as a supervisor and personnel manager with

the Bellevue Police Department. It is true that Van Blaricom has little personal experience

conducting traffic stops. But Plaintiff offers Van Blaricom's opinion in order to help the jury

understand police policies, so Defendants' attack misses the mark on this point.

The Court finds Defendants' third argument well taken. Van Blaricom's opinion that Plaintiff "should not have been accepted into ECDC without the perquisite of a hospital medical clearance" goes beyond the scope of his expertise as a former police chief. Put differently, Van Blaricom is qualified to testify about whether a trained police deputy should have taken Plaintiff to ECDC, but he is not qualified to testify about whether ECDC should have accepted Plaintiff. The Court will therefore grant the motion as to Van Blaricom's opinions as to Defendants Walker, Salcido, and Danette Martinez.

Defendants' Motion to Strike next argues that even if Van Blaricom is qualified to opine on whether or not Defendants Jones and Martinez had a duty to recognize a medical emergency and that they breached this duty in this case, his opinions are not reliable. This conclusion is based on three arguments: (1) the available evidence cannot justify Van Blaricom's conclusion that Defendants Martinez and Jones were deliberately indifferent to a clear medical emergency (Motion to Strike Van Blaricom at 9); (2) Van Blaricom's opinions are prejudicial and confusing and should be excluded under Rule 403; and (3) Van Blaricom's opinions are legal conclusions that impermissibly intrude on the jury's role in determining whether Defendants violated the Fourteenth Amendment.

These three arguments are essentially the same: Defendants simply contend that Van Blaricom's expert opinions have no basis in the record; therefore, they are merely an expert's unsupported "ipse dixit" that the police officers were deliberately indifferent to Plaintiff's obvious medical need. Motion to Strike Van Blaricom at 9 (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Plaintiff responds that Van Blaricom's opinion that police officers should "err on the side of caution and presume that there is a medical emergency" when there is

no accompanying objective evidence of intoxication is based on evidence in the record and his lengthy experience as a police commander. Response at 9.

The Court concludes that Van Blaricom's opinion has a sufficient basis in experience and the evidence in the record to help the jury understand whether reasonable officers in the Deputies' position would have opted for a different course of action in this situation. Van Blaricom's testimony would help the jury understand that not every police encounter should result in criminal charges. Accordingly, the Court will deny Defendants' Motion to Strike Van Blaricom to the extent it is based on the contention that Van Blaricom's testimony is inadmissible under Rule 702.

Parts of Van Blaricom's report state legal conclusions about Defendants' conduct. For example, Van Blaricom's opines that the "arresting deputies failed to exercise a reasonable standard of care in their deliberately indifferent response to plaintiff's obvious medical emergency." Doc. No. 139-1 at 5. While Van Blaricom justifies his "use of certain terms [such as 'deliberately indifferent']…[as a reflection of] my training and experience[,]" Doc. No. 139-2 at 3, the Court agrees with Defendants that this disclaimer does little to reduce the likelihood of jury confusion. The Court will require Van Blaricom to limit his testimony to his knowledge of applicable police practices, and whether those practices were followed in this case. The Court will not allow Van Blaricom to opine that Defendants' conduct was deliberately indifferent, and will grant Defendants Motion to Strike Van Blaricom in this respect.

Last, Defendants argue that Van Blaricom's "final" report and the opinions it contains should be excluded because it was produced after the March 10, 2014 deadline for the production of expert reports set by Chief Magistrate Judge Molzen. Motion to Strike Van Blaricom at 5–6. Plaintiff responds that the supplementation was proper under Fed. R. Civ. P. 26 because it was

required under Rule 26(e)(2)'s duty to supplement expert reports. Response at 11. Further,
Plaintiff argues that the tardy production of the final report does not prejudice Defendants
because they deposed Van Blaricom after the final report was produced. *Id.*[12]

Van Blaricom's final report was submitted to account for the deposition testimony of
Defendants Salcido, Danette Martinez, and Jones. Since the Court will exclude Van Blaricom's
opinions about ECDC's decision to accept Plaintiff, most of the additional information in the
final report is irrelevant. As to the supplemental opinions about Mr. Ryan's opinions, the Court
finds that the additional information is necessary to address an "incomplete" aspect of Van
Blaricom's report, and that supplementation is permitted under Rule 23(e)(2). In any event,
because Defendant had a chance to depose Van Blaricom after the final report was produced and
the production occurred almost a year ago, the Court finds that the alleged tardiness of the
supplementation is harmless. The Court will therefore not exclude the final report on this ground.

     B.     <u>Plaintiff's expert Moore and Defendants' Motion to Strike Moore</u>

     i.     <u>Moore's qualifications. report, and deposition testimony</u>

     1.     Moore's qualifications

Moore is an independent nurse consultant working in correctional health care. Doc. No.
136-1. Moore has advanced certification in correctional health care and worked in correctional
health care at the national level for over 30 years. *Id.* Moore was Health Services Administrator
for the Cook County Juvenile Detention Center, and she was also the Chief Operating Officer for
Correctional Healthcare Management where she oversaw contracts in Colorado, Oklahoma, and
New Mexico. *Id.* Moore is familiar with nursing care provided in New Mexico prisons because

---

[12] Plaintiff also argues that the disclosure was not tardy in any event because disclosures only need be made 30 days
prior to trial under Rule 26(a)(3)(B). *See* Response at 11. But Plaintiff omits the beginning of Rule 26(a)(3)(B),
which states that the 30-day deadline only applies when the Court does not order otherwise. Since the Court ordered
otherwise in this case (*see* SCHEDULING ORDER (Doc. No. 78) at 2), this argument is frivolous.

she wrote the Request for Proposals for Medical Services for New Mexico's prisons and as part

of that work, Moore visited all correctional facilities in New Mexico. *Id.*

>   2.   Moore's expert report

Moore's report, dated June 11, 2012, states opinions on two topics: (1) that Plaintiff

received grossly inadequate medical care at the ECDC; and (2) that Nurse Walker conducted an

inadequate assessment.

Moore recites the following facts of the case:

> Upon arrival at the [ECDC], the behavioral observations sheet indicated that Mr. Marquez['s] attention span was easily distracted, his comprehension was below average and his thought process sluggish.

Doc. No. 136-1 at 2.

> Officers Martinez and Jones had to physically assist Mr. Marquez into the detention center because he was unable to walk on his own. The arresting officers told the correctional officers that Mr. Marquez was coming off drugs or narcotics.

*Id.*

> A nurse's note written on 9/24/09 indicated that Mr. Marquez had been in a car wreck and was sent to the hospital for blood work only. Nurse Walker indicated Mr. Marquez did not see a physician. Nurse Walker reports that Mr. Marquez denied medical problems. As an afterthought she added will monitor to her nursing note.[13] On 9/24/09 at 1300 Nurse Walker recorded that she was called to the booking area because Mr. Marquez was unable to stand without assistance. During this encounter she did take Mr. Marquez's vital signs which were 133/87 P 100 R 18 T104. She indicated that Mr. Marquez was alert and oriented but had slurred speech.

*Id.* at 2-3.

> Officers report show[s] that Mr. Marquez was transported to the Carlsbad Medical Center at 13:33 hours. At 15:45, the acting

---

[13] Moore does not explain how she determined that the note "will monitor" was entered as an afterthought. However, in her deposition, Moore admitted this statement was "sheer conjecture." (Mot. Ex. B Moore Tr. 116:15-17.)

warden was notified that Mr. Marquez was being admitted to the
hospital with possible meningitis. At approximately 16:20 hours,
Mr. Marquez was released from custody of the detention center.

*Id.*

Moore's opinion on the treatment of Plaintiff at the ECDC consists of two sections. The

first is entitled "Inadequate Access to Medical Care" and the second is entitled "Inadequate

Assessment by the Nurse." *Id.* at 3-4.

In the first section, Moore opines that the arresting officers "should have obtained

clearance from a medical doctor prior to bringing him to the jail." *Id.* at 3.

> The correctional officers should not have accepted Mr. Marquez. It
> was clear by the correctional officers['] description of Mr.
> Marquez's confusion, his inability to stand indicated that he was
> mentally unstable and should not have been accepted in the
> detention center. The patient required care by a physician. Instead,
> Mr. Marquez was denied medical care by the arresting officers
> even though he was actually in the hospital and could have been
> seen by a physician.

*Id.*

> With regard to ECDC policies, Moore states,
> [b]y policy of the [ECDC], prior to the acceptance of an inmate,
> intake staff is to determine that the inmate is in need of medical
> attention. Officer Salcido and Nurse Walker violated this policy
> because it was evident that Mr. Marquez needed medical attention
> due to his inability to maintain his balance and inability to focus.
> . . .
> The policy also states that the booking officer was to inquire of the
> arresting officers if the inmate had any problems medical,
> intoxication or behavioral problems. If there is a question
> regarding the acceptance of an inmate, the supervisor should be
> notified. This policy was not followed . . .

*Id.*

Moore further described the ECDC policy:

> [I]ndividuals too intoxicated to provide booking information shall
> be placed in a padded cell on a 15 minute watch. While Officer
> Salcido indicates that he would have put Mr. Marquez on a 15
> minute watch there is no evidence in the 2 ½ hours that Mr.
> Marquez was incarcerated that this was done.

*Id.* at 3-4.

In the second section of her report, Moore opines,

> Nurse Walker knew that Mr. Marquez had been involved in a motor vehicle accident, yet she made no attempt to assess him for a head injury, to perform checks of his pupils, or vital signs or to provide a careful screening or observation. Even though she wrote that she would monitor him, she did not return to the intake area until 2.5 hours after her initial assessment. . . . She should have been able to determine that Mr. Marquez had an urgent condition by his confusion and inability to stand. Instead she relied on the misrepresentation of the arresting officers and failed to perform an adequate nursing assessment.

*Id.* at 4. Moore continues,

> [i]f Mr. Marquez were withdrawing from alcohol or drugs he would have been tremulous, agitated, having possible hallucinations as well as disorientation and ataxia.[14] Mr. Marquez had a serious condition and for two and a half hours, [ECDC] employees observed him and did not call for further medical care. There is no notation in the nurse's notes of Nurse Walker that she called a physician to direct the care of this patient.

*Id.* Moore concludes,

> The receiving screening process is a structured inquiry designed to identify and meet the urgent needs of individuals, to identify and meet any known or identified medical need, and to identify inmates that are potentially contagious. The intent of the receiving screening is to identify potential emergency situations among new arrivals to the facility, and to ensure that those patients receive the care that is required. The intake officer, Deputy Salcido indicated that Mr. Marquez was confused and could not stand on his own yet he did not refer Mr. Marquez for further medical evaluation. . . .
> [T]he care provided to Mr. Marquez was grossly inadequate and deliberately indifferent to his obvious medical needs. The nurse should have refused to accept Mr. Marquez [absent] . . . medical clearance . . . . Alternatively, the nurse should have immediately taken and documented his vital signs and performed a medical

---

[14] "Ataxia" is defined as "lack of muscular coordination." http://dictionary.reference.com (Ap. 22, 2015).

evaluation and made a physician aware of his condition immediately upon presentation.

Nurse Walker's and the correctional staff['s] actions were willful, wanton and deliberately indifferent to Mr. Marquez' obvious medical needs. Even after they inappropriately accepted him, they further allowed this patient to languish several hours in his cell when urgent medical care was needed. They violated the policies of the jail by accepting this individual that exhibited that he had a serious medical need. . . . Nurse Walker provided markedly substandard nursing care and was deliberately indifferent to the medical needs of Mr. Marquez.

*Id.* at 4-5.

### 3.    Moore's deposition testimony

Moore testified at her deposition that she would be limiting her trial testimony to the contents of her report. Doc. No. 136-2 at 53:13-25. Moore testified that she based her opinion on the Standards for Health Services in Jails (2008), which states that "persons who are unconscious, semiconscious, bleeding, mentally unstable, or otherwise urgently in need of medical care are . . . referred immediately for care and medical clearance into the facility. . . ." *Id.* 25:9-25. Moore opined that under this standard Plaintiff should not have been accepted into the ECDC without medical clearance. When asked which condition Plaintiff would have exhibited under this standard, Moore answered "semiconscious or incoherent. . . . He was not capable of walking by himself or maintaining balance." *Id.* 26:9-12. When asked whether she had an opinion as to whether the delay in treatment exacerbated Plaintiff's condition, Moore answered "Yes, I do. I think that any time you have brain swelling, it causes further injury." *Id.* 51:9-14. When asked about Nurse Walker's note that Plaintiff was "alert and oriented," Moore admitted that a patient with West Nile Virus would exhibit periods of lucidity. *Id.* 75:7-12. However, Moore stood by her criticism of Nurse Walker's note as "probably – . . . incorrect." *Id.* 76:15-17.

Moore opined that Nurse Walker did an inadequate assessment under the ANA standards for correctional nurses: "She didn't ask about the history of the car wreck. . . . She didn't take any vital signs. . . . She did not do an assessment." *Id.* 79:5-22. When questioned about how soon after an inmate arrives at a jail, an assessment must be performed under the ANA guidelines, Moore answered, "as soon as possible. The ANA standards don't have a timeline. But if you are going to do a—talk to a patient, who is sick, then it is expected that you will do an assessment." *Id.* 80:6-10. When pressed for an opinion on how soon is "as soon as possible" Moore answered, "As soon as possible to me means within an hour, and that's how I judge it." *Id.* 89:12-14. Moore testified that vital signs should be done during a "receiving screening." However, she admitted that the Standards did not have that requirement: "vital signs are routinely taken during the receiving screening process, whether it says it in that book or not." *Id.* 91:7-9. When the Standards were placed in front of Moore, she testified, "I don't see anything about vital signs in this book. I can only tell you that it is my experience that vital signs are taken on all intake receiving screenings where they do them." *Id.* 92:19-22. Moore then admitted she was the executive director of the committee that prepared the Standards.

In her testimony, Moore reiterated that Nurse Walker, when called to the intake area to see Plaintiff, "should have done it [health screening] right away, because the officer called her. He wasn't sure that they could accept the patient." *Id.* 94:15-19. Moore criticized Nurse Walker's failure to monitor Plaintiff's condition during the time he was in the intake area even though Nurse Walker wrote in her notes, "will monitor." *Id.* 116:20-24.

Moore stated that ECDC personnel breached their own policy by not putting Plaintiff into a padded cell on 15-minute watch, but Moore admitted that the protocol would not have assisted

Plaintiff: "It's just a breach of policy, that's all." *Id.* 132:19-23. Moore conceded that instead of 2.5 hours, Plaintiff was at ECDC for 90 minutes. *Id.* 134:10-12.

Moore stood by her conclusion that Nurse Walker was deliberately indifferent: "where you haven't done anything and it's resulted in further harm . . . she breached that duty by not providing care." (*Id.* 155:10-15.) When questioned as to whether Nurse Walker was aware of Plaintiff's serious medical need, Moore testified, "that is my biggest contention with the nurse's action, is that she didn't know because she didn't probe . . ." *Id.* 155:21-23.

ii.     Defendants' arguments for excluding Moore's testimony

Defendants do not attack Moore's qualifications. The Motion contends that Moore's report "is riddled with material misrepresentations of this record." *Id.* at 3. First, Moore admitted that Plaintiff was in the ECDC only 1.5 hours, not the 2.5 hours stated in her report. However, that mistake was based on the time notation in Nurse Walker's notes. Doc. No. 136-2 at 134:10-13.[15] Second, Moore thought that arresting Officer Jones had to physically assist Plaintiff into the ECDC, but later admitted that this statement was untrue. *Id.* 113:1-25. Moore contends that she "doesn't believe" Nurse Walker's notes indicating that Plaintiff was alert and oriented when Nurse Walker first saw Plaintiff because this statement conflicts with the arresting officers' observation that Plaintiff  was not responsive. However, Moore admitted that West Nile Virus can cause the patient to suffer periods of lucidity and lack of lucidity. *Id.* 75:1-25, 76:1-25. Moore concluded that the ECDC personnel "allowed [Plaintiff] to languish in his cell," but admitted in deposition testimony that Plaintiff remained in the booking area while at ECDC. *Id.* 177:5-25, 178:1-12.

---

[15] Initially, it was alleged that Plaintiff arrived at the ECDC at 10:30 am based on Nurse Walker's notes. Now it has been alleged that the ECDC nurse's notes were incorrect and that Plaintiff arrived at 11:30 am. Moore acknowledged this in her deposition testimony *supra*.

At her deposition, Moore testified she relied on the 2008 version of Standards for Health Services in Jails (Standards). Moore considered Plaintiff's condition when he arrived at ECDC as "semiconscious" and subject to those protocols. For those inmates, the Standards require a screening be done "as soon as possible," which Moore contends means within an hour. Defendants dispute that the Standards applied. Defendants maintain that even if ECDC personnel violated the Standards, that does not mean Plaintiff's constitutional rights were violated. Lastly, Moore concludes that the ECDC personnel were "deliberately indifferent" to Plaintiff's "obvious" medical needs. Defendants maintain that this is a legal conclusion that should be excluded. In sum, Defendants argue that Moore's report should be excluded under Rule 702 because it is based on unreliable information, is "conclusion driven", and contains improper legal conclusions. Alternatively, Defendants argue that Moore's opinion should be excluded under Fed. R. Evid. 403 because the probative value of her testimony would be outweighed by the possibility that the jury would be confused by her conclusions.

Plaintiff maintains that Moore's opinions are based on her expertise, medical literature, and a comprehensive review of the facts in this case, many of which the Defendants' own experts acknowledge. Plaintiff contends that Moore's conclusions differ from Defendants' experts' conclusions, but weighing the testimony of conflicting experts is "an issue solely within the province of the jury." *Valdez v. Ward*, 219 F.3d 1222, 1238 (10th Cir. 2000). Plaintiff further points out that under the rules of evidence, courts should liberally admit expert testimony. *United States v. Gomez*, 67 F.3d 1515, 1526 (10th Cir. 1995) (describing Rule 702 as a "liberal standard"). Plaintiff argues that Moore's qualifications, although not questioned by Defendants, lend support to her reliability. *Sawyer v. Southwest Airlines Co.,* 243 F. Supp. 2d 1257, 1266 (D. Kan. 2003). Plaintiff asserts that Moore properly relied on deposition testimony of the deputies,

the ECDC officers, and the Plaintiff, Defendant's expert disclosures, the medical records, Nurse Walker's affidavit, and information from the CDC on West Nile Virus. Moore bases her conclusion of deliberate indifference on Defendants' acts, and her criticism is based on published standards of care for jails, as informed by Moore's extensive experience overseeing medical care operations in detention facilities.

According to Moore, a proper medical screening would have revealed that Plaintiff was unfit to be booked into ECDC and that ECDC personnel, particularly Nurse Walker, did not perform a proper medical screening under the ECDC policy, under the applicable standards for jails. However, Moore admitted that her standards are higher than the published standards. Any weakness in Moore's conclusions, such as whether a detention center must do an initial medical screening within one hour of arrival is, of course, debatable. But, these weaknesses relate to the weight the jury may give to Moore's testimony, not its admissibility.

Plaintiff has shown that Moore's opinion is based on reliable information. Moore determined that the staff at ECDC provided grossly inadequate care by failing to screen Plaintiff and assess his medical condition given his altered mental state. Moore summarized the standards she applied, and she identified where the standards differed from her experience, such as, when to take a detainee's vital signs. Defendants will be allowed to question whether her conclusions are valid given the applicable standards. In short, Plaintiff has sufficiently shown that Moore's testimony is based on reliable information, experience, and standards applicable to detention centers.

Moore's testimony, however, improperly includes a legal conclusion that the ECDC personnel acted with deliberate indifference to Plaintiff's obvious medical condition. Even though Moore purports to define what she means by deliberate indifference, it is the Court's duty

31

to instruct the jury on the meaning of deliberate indifference in the context of Plaintiff's claim. Therefore, it is inappropriate for Moore to opine on the definition of deliberate indifference or to opine that the ECDC personnel were deliberately indifferent to Plaintiff's medical need. *See Cox v. Glanz*, --- F. Supp. 2d ---, 2014 WL 916644 at *3 (N.D. Okla. Mar. 10, 2014) (slip op) (excluding conclusion by corrections expert that jail personnel were deliberately indifferent to suicidal inmate's mental condition). Moore's conclusions that Nurse Walker and other ECDC staff acted with deliberate indifference are not  appropriate subjects for expert testimony because they state opinions on ultimate issues of law.

        C.     <u>Defendants' Motion for Qualified Immunity</u>

        i.     <u>Motion for Qualified Immunity on Plaintiff's claims under 42 U.S.C. § 1983</u>

Defendants contend that because Plaintiff's own experts have acknowledged that Plaintiff's behavior was consistent with the effects of alcohol or narcotics, there is no evidentiary basis for a jury to infer that Plaintiff was suffering an obvious medical emergency while he was in Defendants' custody. Motion for Qualified Immunity at 9. Since there is no way to conclude Plaintiff was in obvious need of emergency medical care, Defendants contend that there can be no deliberate indifference, and hence no violation of Plaintiff's constitutional rights. *Id.*

But Plaintiff's experts testified that Plaintiff's symptoms were consistent with the effects of alcohol or narcotics intoxication *and* with West Nile encephalitis. And as this Court has already concluded, there is evidence to support an inference that Defendants knew or should have known that Plaintiff was not drunk or under the influence of drugs: his 0.00 BAC reading, steadily worsening condition, and the absence of any drug or alcohol paraphernalia in Plaintiff's car. As the Court has already concluded once before, this evidence creates an issue of fact that must be resolved by a jury.

Next, Defendants argue that they are entitled to qualified immunity because "Defendants reasonably believed that the Plaintiff was suffering from drug intoxication." Motion for Qualified Immunity at 13. But this is just a rehash of Defendants' first motion for summary judgment based on qualified immunity. Since this Court's ruling on that motion (and the Tenth Circuit's mandate affirming that ruling), the authenticity of what is depicted in the video recording of Plaintiff's arrest—which, Defendants concede, "speaks for itself,"—has not been called into question. Put differently, Defendants have dressed a motion to reconsider as a renewed motion for qualified immunity without even a perfunctory attempt to explain how this Court got either the facts or the law wrong the first time around.[16]

    ii.    <u>Defendants' Motion for Qualified Immunity as to Plaintiff's state law claims</u>

Although the arguments are presented in a motion for summary judgment "based on qualified immunity," Defendants contend that they are entitled to summary judgment on Plaintiff's claims under the New Mexico Tort Claims Act because Plaintiff cannot satisfy necessary elements of these claims with any evidence in the record.

First, Defendants contend that Count III of the Amended Complaint, which asserts professional negligence against Defendant Walker, should be dismissed because there is "no basis at all for contending that Ms. Walker was professionally negligent." Despite this bald assertion, the very next sentence acknowledges that there is indeed evidence that could support such a contention: Moore's testimony that Defendant Walker breached the applicable standard of care. *See* Motion for Qualified Immunity at 15. Thus, Defendants' argument isn't that there is

---

[16] Defendants state that even "in the event this Court were to find" that Defendants violated Plaintiff's constitutional rights, "and [even if] Plaintiff were to provide authority establishing that [the constitutional right] was clearly established under these circumstances, it is still apparent that these Defendants acted objectively reasonably…so they are entitled to qualified immunity[.]" Put differently, Defendants contend that the Court must still grant summary judgment because the violation of Plaintiff's clearly-established constitutional rights was objectively reasonable in the circumstances of this case. But an objectively reasonable violation of clearly-established constitutional rights is an oxymoron.

"no evidence," but rather that the Court should not consider the evidence that supports this claim. For the reasons stated above, the Court will not exclude Moore's testimony, and therefore will not enter summary judgment on Count III.

Defendants next argue they are entitled to summary judgment on Count IV of the Amended Complaint, which asserts various claims under the New Mexico Tort Claims Act against all Defendants. Count IV asserts claims for (1) negligent maintenance of a building against Defendants Walker, Salcido, and Danette Martinez; (2) false imprisonment against all defendants; and (3) battery against Defendant Martinez.

The Court will dismiss Plaintiff's negligent maintenance of a building claims. A claim for negligent maintenance of a building requires a plaintiff to show "damages…caused by the negligence of public employees…*in the operation or maintenance* of any building…." N.M. Stat. Ann. § 41-4-6 (West 2013). Plaintiff's claims stem entirely from Defendants' allegedly reckless or intentional conduct, not any aspect of the buildings he was kept in. Accordingly, the Court will enter summary judgment on Plaintiff's negligent maintenance of a building claims.

The question is closer as to Plaintiff's false imprisonment claims. "False imprisonment consists of intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so." N.M. Stat. Ann. § 30-4-3 (West 2013). Defendants argue that they had "lawful authority" to arrest Plaintiff because they had probable cause to believe he was driving under the influence of alcohol. Motion for Qualified Immunity at 16.

The Court will grant summary judgment on Plaintiff's false arrest claim because Defendants did not confine Plaintiff "with knowledge that [they] had no lawful authority" to arrest Plaintiff. While there is evidence that Defendants were reckless or deliberately indifferent

34

to Plaintiff's obvious medical need, this fact alone cannot support an inference that Defendants *knew* they had no authority to detain Plaintiff.[17]

Plaintiff's Amended Complaint asserts that Defendant Martinez is liable for battery because his negligence caused Mr. Marquez to be subjected to an unwanted blood draw after his arrest. *See* Amended Complaint ¶ 150. Defendant Martinez contends that Plaintiff cannot proceed on his battery claim against Martinez because Plaintiff consented to the blood draw. Motion for Qualified Immunity at 16. Plaintiff responds that because "a law enforcement officer or agency may be held liable under [the Tort Claims Act] for negligently causing infliction" of an intentional tort, Defendant Martinez may be held liable for the hospital phlebotomist's battery. Response at 20 (quoting *Bober v. N.M. State Fair*, 111 N.M. 644, 654–654, 808 P.2d 614, 623–624 (N.M. 1991)).

But "[a] person is liable for the intentional tort of simple battery when the person intentionally causes bodily contact to the plaintiff in a way *not justified by the plaintiff's apparent wishes or by a privilege*, and the contact is harmful or offensive to the plaintiff." *Pena v. Greffet*, 922 F.Supp.2d 1187, 1228 (D.N.M. 2013) (Browning, J.) (emphasis added) (citing 1 Dan B. Dobbs, *The Law of Torts* § 28, at 52–53)) (internal citation omitted). Here, New Mexico law presumes that any driver has consented to a blood test if arrested. *See* N.M. Stat. Ann. § 66-8-107 (West 2013). And while Plaintiff claims that he was "incapable" of giving consent to the blood draw because of his illness, New Mexico law also presumes that someone incapable of refusing a blood draw has consented to the blood draw. *Id.* § 66-8-108. Since the phlebotomist

---

[17] Since the existence of probable cause is determined objectively, its presence or absence in this case has no bearing on whether there is evidence to satisfy the mens rea requirement for a claim for false imprisonment. *See Franco v. Bd of Cnty. Comm'rs for the Cnty. of Roosevelt*, --- Fed.Appx. ---, 2015 WL 1639561 at *3 (10th Cir. April 14, 2015) (unpublished) (describing mens rea requirements for a false arrest claim).

was privileged to make the blood draw, there was no battery; and since there was no battery, the Court will enter summary judgment on Plaintiff's battery claims against Defendant Martinez.

D.   <u>Defendants' Motion to Strike Suite</u>

Defendants' Motion to Strike Suite challenges the basis of Dr. Suite's conclusion and the reliability of his methodology.[18] The Court will summarize Dr. Suite's qualifications and opinions before addressing the Motion to Strike Suite.

i.   <u>Dr. Suite's qualifications and opinions</u>

Dr. Suite is a board-certified neurologist with an M.D. from The Johns Hopkins University School of Medicine. Doc. No. 151-1 at 2, 3. Dr. Suite currently has a private practice in neurology and neurological rehabilitation, where he provides "care for clinic patients and consultative services to the public and private sectors". *Id.*; Doc. No. 140-1 at 1.

Dr. Suite offers the following opinions:

1.   The delay in access to medical care to [Plaintiff] was a cause of the permanent brain injury and life altering personal damages he suffered in this case.

2.   [Plaintiff] was in obvious need of medical attention such that obtaining immediate medical attention for him in the morning hours while he was at Carlsbad Medical Center [i.e., to have his blood tested] would have resulted in the medical professionals taking the proper steps to protect him from the serious brain injury he sustained during the hours that he endured West Nile Virus without the supportive treatment that would have protected him from brain injury.

3.   Had Mr. Marquez been presented as a patient to a medical facility the morning he was taken into custody, the information reviewed indicates he would have presented to medical professionals with an altered mental status that would have required a differential diagnosis. A person presenting as Mr. Marquez did is in clear need of medical attention. Any test results indicating the lack of alcohol as a medical explanation for his presentation would have required a thorough medical investigation to determine and treat the problem.

---

[18] On April 24, 2015, the Court held a *Daubert* hearing. At the hearing, Dr. Suite testified at greater length about his opinions and answered questions posed by the Court and by counsel.

4.      There are readily available measures to protect patients such as Mr. Marquez from brain injury even while the patient has West Nile Virus. Mr. Marquez was deprived of these measures for a significant period of time that spans from the officers' first interaction with him when they saw something was wrong to when he is finally returned to the same medical facility to which he had been taken earlier that day for a blood draw.

5.      The information reviewed demonstrates that Mr. Marquez exhibited behavior of a person in clear and obvious need of medical care and a person who is demonstrating indicia of seizures during the time he is in law enforcement custody. Had the arresting officers taken the effort to help, rather than prosecute, Mr. Marquez and obtain medical attention in light of his presentation, a competent medical professional would have recognized and treated the signs of seizures so as to protect Mr. Marquez from brain injury while the West Nile Virus ran its course.

6.      To a reasonable degree of medical certainty, as a result of the delay to medical evaluation, attention, and care, Mr. Marquez has suffered post West Nile encephalitis / encephalopathy, seizure disorder, Parkinsonian syndrome, permanent cognitive impairment due to encephalitis, mood instability due to encephalitis, personality change due to encephalitis all of which are serious life altering injuries. The delay in access to medical care, to a reasonable degree of medical certainty, was a cause of Mr. Marquez's injuries.

Doc. No. 140-1 at 2–3.

ii.      Defendants' challenge to the basis of Dr. Suite's testimony

Defendants challenge the factual basis of Dr. Suite's testimony "that the delay in access to medical care to Plaintiff was a cause of the permanent brain injury and life-altering personal damages he suffered in this case." Motion to Strike Suite at 3 (quotation, alteration omitted). *See* Fed. R. Evid. 702(b). Defendants' challenge proceeds from the following syllogism:

1.      There is no generally-accepted treatment for West Nile Virus aside from

"supportive therapy" (i.e., mitigation of disease symptoms like fever or seizures).

Motion to Strike at 3.

2.      All of Plaintiff's claimed damages stem from brain damage caused by seizures.

      3.      Plaintiff did not suffer any seizures while in Defendants' custody. Motion to

            Strike at 4.

Defendants argue Dr. Suite does not dispute any of these premises, so his conclusion that

Plaintiff's permanent life altering injuries were caused by Defendants' conduct (i.e., the delay in

getting Plaintiff to the hospital) has no factual or theoretical basis. Motion to Strike Suite at 3–4.

      Plaintiff disputes the second and third premises of Defendants' argument. As to the

second premise, Plaintiff contends that the seizures were only one of several primary causes of

Plaintiff's brain damage. In addition to his seizures, Plaintiff contends, the intracranial pressure

(relieved by the spinal tap at the Carlsbad Medical Center) caused by the West Nile viral

encephalitis was an additional major cause of Plaintiff's injuries. Response at 7; Doc. No. 140-3

at 5. In other words, Plaintiffs assert that Dr. Suite's conclusion is based not on Defendants'

specific failure to prevent seizures but more broadly on Defendants' denying Plaintiff supportive

care necessary for the treatment of West Nile Virus. As to the third premise, Plaintiff contends

that although Plaintiff did not enter into convulsions and complete unconsciousness while in

Defendants' custody, his erratic and unresponsive behavior after his arrest were classic "indicia"

of seizures, and that in any event, the elevated intracranial pressure was itself sufficient to cause

Plaintiff's claimed damages. Doc. No. 151 at 6.

      The Court concludes that there is evidence in the record sufficient to provide a basis for

Dr. Suite's testimony that the delay in treatment was a substantial cause of Plaintiff's injuries.

Even assuming the truth of Defendants' third premise—that there is no evidence Plaintiff

suffered from seizures while in Defendants' custody—Dr. Suite's testimony is based on a delay

in providing supportive care, not on the delay in providing antiseizure treatment. In other words,

Defendants' argument fails on the second premise, because Dr. Suite has testified (and there is

evidence in the record to support this testimony) that Plaintiff's harm stems from being denied supportive care in general. *See* Deposition of Dr. Suite, Doc. No. 140-2 at 8 ("Q: As we sit here today…can you say, to a reasonable degree of medical probability, that the treatment rendered by Carlsbad Medical Center did anything to assist him with his West Nile virus? A: I can…. I think that the supportive care that he received at that facility was within the standard of care and appropriate and tailored to this particular virus, as well as other viruses and other bacteria.").

As to Dr. Suite's second opinion that Plaintiff was in "obvious" medical need and that the police officers should have "taken the effort to help, rather than prosecute" Plaintiff, *see* Doc. No. 140-1 at 3, the Court will grant the Motion to Strike Suite. The Court finds that Dr. Suite, as a medical doctor, is not qualified to opine about what should or should not be obvious to a lay person or a police officer; therefore, such testimony would not be helpful to the jury. And in any event, Dr. Suite's opinion has no evidentiary basis other than the dashcam footage of Plaintiff's arrest and the testimony of other witnesses. In other words, Dr. Suite's opinion that Plaintiff's condition would have been "obvious" to the arresting officers is nothing more than an attempt to transform *evidence* that Plaintiff's condition was obvious to *proof* that Plaintiff's condition was obvious to these officers. Accordingly, it is the inadmissible "ipse dixit" of an expert that the Court will exclude. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

iii.    <u>Defendants' challenge to the reliability of Dr. Suite's testimony</u>

Defendants challenge the reliability of Dr. Suite's methodology because he failed to engage in any "differential diagnoses" that considered possible alternative sources of Plaintiff's claimed damages. Motion to Strike Suite at 5. *See also* Fed. R. Evid. 702(c). In other words, Defendants contend that Dr. Suite unreasonably ignored other potential causes of Plaintiff's

39

damages in order to reach the foreordained conclusion that Defendants conduct caused Plaintiff's injuries. *See* Motion to Strike Suite at 5.

The problem with this argument is that it attacks the weight the jury should give Dr. Suite's testimony, not its admissibility. *See Cyrus v. Town of Mukwonago*, 624 F.3d 856, 864 n.8 (7th Cir. 2010) ("an expert's inability to isolate one specific factor when multiple factors cause an injury implicates the weight of the expert's testimony, not its admissibility." (citing *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000)). Defendants cite no authority—legal or medical—for their assertion that Dr. Suite should have put forward "meaningful differential diagnoses[.]" Motion to Strike Suite at 5. To be sure, it would be preferable (from Plaintiff's perspective) for Dr. Suite to have considered and eliminated other potential causes of Plaintiff's injuries. But his failure relates to the strength of Dr. Suite's opinions, not their admissibility. Put differently, Dr. Suite's alleged failure to consider different causes gives Defendants a basis for cross-examining Dr. Suite, not excluding Dr. Suite's testimony altogether.

In conclusion, the Court will grant Defendants' Motion to Strike Suite with respect to Suite's opinion that Plaintiff was suffering from an obvious medical emergency; it will otherwise deny the Motion to Strike Suite.

E.      Defendants' motion to exclude the testimony and opinions of Gilbert Martinez, Ph.D.

i.      Martinez's qualifications and opinions

Martinez opines that "based on reasonable medical and psychological probability[,] [Plaintiff] suffers from mild deficits in cognition and severe deficits in behavioral and emotional functioning due to the acute encephalitis he suffered in September, 2009." Doc. No. 137-2 at 13. Martinez opines that Plaintiff has "developed severe mood and behavioral disorders due to the

direct effects of brain damage on the neurological substrates that mediate emotional and behavioral functioning." *Id.* Martinez expects that Plaintiff's deficits and disorders will be permanent. *Id.* Martinez opines that due to Plaintiff's problems, "it is unlikely that [Plaintiff] will be able to live fully independently or maintain competitive employment without accommodation." *Id.*

Martinez goes on to opine on the "functional implications" of Plaintiff's cognitive deficiencies. *Id.* Martinez opines that Plaintiff's "cognitive limitations will impair his ability to learn and act upon learned verbal and nonverbal information in an efficient manner." These deficits will interfere with his ability to function adequately in most social and occupational settings." Martinez concludes Plaintiff will "have difficulty carrying out moderately complex tasks such as paying bills, remembering appointments or other facts, or keeping track of information." *Id.* at 13–14. Martinez concludes that Plaintiff "will demonstrate poor judgment when asked to make informed decisions regarding his treatment or other important personal matters…." *Id.* at 14.

Finally, Martinez makes several "recommendations." *Id.* These include "intervention in an inpatient rehabilitation program[,]" "medical intervention for [Plaintiff's] affective disorder...includ[ing] long-term administration of psychotropic medication[,]" "admission into an inpatient psychiatric unit if he is determined to be dangerous to himself for others[,]" "psychological counseling to address [Plaintiff's] emotional and behavioral problems[,]" vocational assessment and counseling to improve his employability, and "[repeated] neuropsychological evaluation in 1-2 years…." *Id.* at 14–15.

ii.     Defendants' challenge to the basis and reliability of Martinez's testimony

Defendants argue that Martinez's opinions are without factual basis and his methodology is unreliable. As to the factual basis of Martinez's testimony, Defendants contend that Martinez impermissibly relies on Plaintiff and his mother's self-serving statements about the extent of Plaintiff's suffering after he contracted West Nile Virus. Motion to Strike Martinez at 4. Next, Defendants attack the reliability of Martinez's methodology, arguing that Martinez "fails to engage in any meaningful differential analysis" by "ignor[ing] deeply troubling incidents which predate Plaintiff's bout with the West Nile Virus." Motion to Strike Martinez at 4–5.

Defendants' factual basis argument for excluding Martinez's testimony proceeds by analogy to Fed. R. Evid. 803(4), which excepts statements made for the purpose of obtaining a medical diagnosis from the rule against hearsay. Motion to Strike Martinez at 10. Plaintiff plays along, arguing that to the contrary, Plaintiff and his mother's statements to Martinez would in fact be admissible under Rule 803(4). *See* Response (Doc. No. 150) at 9. But while Rule 803 would govern the admissibility of Plaintiff and his mother's out of court statements into evidence, it does not have any bearing on whether or not Dr. Martinez can reasonably rely on those statements in forming his opinion. *See* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). But Defendants do not argue that experts "in the particular field would [not] reasonably rely on" Plaintiff and his mother's statements, *see* Fed. R. Evid. 703.

Next, Defendants argue that "Martinez implicitly vouches for the credibility of Plaintiff, not to mention his mother, and relies on their account even when it is demonstrably false…."

Motion to Strike Martinez at 4. Defendants contend that Martinez's report and testimony are analogous to the expert testimony of Dr. Ornelas in *United States v. Charley*, 189 F.3d 1251, 1265 (10th Cir. 1999). In that case, the Tenth Circuit Court of Appeals held that it was error for the district court to allow Dr. Ornelas to offer an "unconditional opinion that…the [victims were] in fact sexually abused" by the defendant. *Id.* at 1266. The court's rationale was that Dr. Ornelas's opinions "encroache[d] upon the jury's vital and exclusive function to make credibility determinations…." *Id.* at 1267.

In this case, Defendants argue that Martinez uncritically accepted Plaintiff and his mother's "demonstrably false" statements that Plaintiff fell into a coma after he left Defendants' custody. Motion to Strike Martinez at 11. Plaintiff responds that Martinez "has not implicitly vouched for the credibility of Plaintiff and his mother. Rather, [Martinez] takes these statements [about Plaintiff's coma] with a grain of salt, not…as absolute fact." Response at 8. Plaintiff argues that Martinez recognized and accounted for inconsistencies in Plaintiff and his mothers' statements when he formed his opinions. *Id.*

Martinez's testimony is distinguishable from the testimony at issue in *Charley*. The *Charley* expert's usefulness in determining whether the victims had been sexually assaulted was indistinguishable from its impermissible use as a means of bolstering the victim's credibility. Here, Martinez does not assert that Defendants caused Plaintiff's damages; instead, Martinez opines about the extent and character of Plaintiff's current mental functions. If the jury credits Martinez's testimony, it will not be because he prevented the jury evaluating Plaintiff and his mother's credibility. Because Martinez is clear about how much he depends on Plaintiff and his mother's statements in forming his opinions, the jury remains free to reject Martinez's conclusions if they find Plaintiff and his mother not to be credible. By contrast, the *Charley*

expert's testimony was used not simply to explain the physical evidence, but also to prevent the jury from making the (permissible) inference that the victims had simply fabricated their stories.

Defendants' Motion to Strike Martinez will be denied.

F.      Defendants' Motion for Summary Judgment as to causation and punitive damages

Defendants make two arguments that they are entitled to summary judgment on Plaintiff's claims under 42 U.S.C. § 1983: (i) there is no genuine dispute that Plaintiff did not suffer substantial injuries, a prerequisite to relief under 42 U.S.C. § 1983 for delaying or denying a prison inmate  medical care; and (ii) even if there is evidence Plaintiff suffered a substantial injury, there is no genuine dispute that the injury was not caused by Defendants' conduct. *See* Motion for Summary Judgment at 11.[19] Next, Defendants offer two arguments in favor of summary judgment that apply to both Plaintiff's claims under 42 U.S.C. § 1983 and Plaintiff's state-law tort claims: (iii) Plaintiff's mother's negligent decision to obtain Plaintiff's discharge from Lovelace against a doctor's advice is an independent intervening cause that relieves Defendants of any liability for injuries Plaintiff suffered afterward; and (iv) Plaintiff's damages claims are too speculative and unsupported by the evidence in the record to be decided by a jury. Motion for Summary Judgment at 13–15. Finally, Defendants argue that (v) they are entitled to summary judgment on Plaintiff's claims for punitive damages because there is no evidence in the record to support an inference that Defendants acted outrageously. Motion for Summary Judgment at 17. The Court will address each argument in turn.

---

[19] Defendants make an identical argument on Page 8 of their Motion for Qualified Immunity.

i.    Whether there is no genuine dispute that Plaintiff did not suffer substantial injuries, a prerequisite to relief under 42 U.S.C. § 1983 for delaying or denying a prison inmate  medical care

Defendants argue that there is no genuine dispute that Plaintiff did not suffer any substantial injuries as a result of Defendants' conduct because when Plaintiff was in Defendants' custody, he did not suffer any of the seizures that caused his life altering injuries. Motion for Summary Judgment at 12. Defendants point to the following facts in support of this conclusion: (1) Plaintiff was able to sign a property inventory form when he was booked; (2) Plaintiff did not request medical care when he was in Defendants' custody or "indicate that he was suffering from any medical condition"; and (3) the first hospital to treat Plaintiff "did not provide [Plaintiff] with any medical care that cured or reversed the West Nile Virus" or provide Plaintiff with any anti-seizure medication that would prevent the brain injuries Plaintiff claims to have suffered. *Id.* at 12–13.

Although Plaintiff's ability to sign an inventory form is evidence that at that moment he was conscious and not having a seizure, this fact alone cannot be dispositive of Plaintiff's denial of care claim. A jury could still infer that Plaintiff was passing in and out of consciousness and having intermittent seizures based on Dr. Suite's testimony, the dash cam footage, and the police officers' testimony about Plaintiff's condition. The second fact is only relevant to the question of whether Defendants were deliberately indifferent to Plaintiff's obvious medical need; it has no bearing on Plaintiff's damages. And the Court rejected the Defendants' summary judgment argument based on this fact in its earlier memorandum opinion and order (Doc. No. 62) that was affirmed by the Tenth Circuit Court of Appeals. As to the third fact, the Court finds that it does not show beyond all genuine dispute that Plaintiff suffered no damages while in Defendants'

custody. There is ample (if not compelling) evidence in the record contradicting Defendants' assertion on this point. *See*, *e.g.*, Deposition of Plaintiff (Doc. No. 152-5) at 2 ("I'm not the same person anymore…. I don't work the same….").

In sum, there is sufficient evidence in the record that Plaintiff has suffered a "substantial injury" to require a jury to determine the merit of Plaintiff's claims. Most of Defendants' arguments in favor of summary judgment on this issue attack Plaintiff's credibility and the perceived weakness of the evidence in support of his claims. But the jury makes credibility determinations and weighs conflicting evidence, not the Court. Accordingly, the Court will deny Defendants Motion for Summary Judgment as to Plaintiff's ability to prove that he suffered substantial harm.

> ii. <u>Whether, even if there is evidence Plaintiff suffered a substantial injury, there is no genuine dispute that the injury was not caused by Defendants' conduct</u>

Defendants contend they are entitled to summary judgment on Plaintiff's claims because Plaintiff contracted the West Nile Virus prior to any contact with Defendants and because there is no recognized treatment for the Virus, only supportive care for its symptoms. Motion for Summary Judgment at 13–14. This argument is identical to Defendants' argument for excluding the report and testimony of Dr. Suite. For the same reasons the Court will deny Defendants' Motion to Strike Suite, the Court will also deny Defendants' Motion for Summary Judgment with respect to causation. In short, Dr. Suite's opinions allow a jury to infer that Defendants' conduct aggravated and increased the pre-existing risk of harm caused by Plaintiff's West Nile Virus.

iii.   Whether Plaintiff's mother's negligent decision to obtain Plaintiff's discharge
       from Lovelace against a doctor's advice is an independent intervening cause that
       relieves Defendants of any liability for injuries Plaintiff suffered afterward

Defendants next argue that Plaintiff's mother's decision to have Plaintiff discharged from Lovelace hospital on October 9, 2009 is an independent, intervening cause that relieves Defendants of any liability for Plaintiff's injuries as a matter of law. *See* Motion for Summary Judgment at 14–15. The problem with this argument is that New Mexico is a comparative fault jurisdiction, and the defense of independent intervening cause has been "virtually eliminated" in favor of the affirmative defense of comparative negligence and other damage setoffs. *Silva v. Lovelace Health Sys.*, 331 P.3d 958, 960 (N.M. Ct. App. 2014). To be sure, "virtually" does not mean "totally." But *Silva*, which Defendants cite in support of their position, only concludes that a jury may be instructed about an independent intervening cause in cases where the evidence gives rise to "reasonable inferences" that the plaintiff's injuries were caused by intentional or unforeseeable conduct independent of the defendants' own negligence. *Id.* Defendants may be entitled to such an instruction, but it does not follow that they are entitled to judgment as a matter of law when there remain contested issues of fact as to causation and liability. *See* Rule 13-305 NMRA (A cause "is sufficient [even] if it occurs in combination with some other cause" so long as it is "reasonably connected as a significant link to the injury or harm.").

The Court will deny Defendants' Motion for Summary Judgment to the extent that it seeks judgment as a matter of law on Plaintiff's claims based on the argument that Plaintiff's mother's conduct forms an independent, intervening cause of Plaintiff's injuries.

iv.   Whether Plaintiff's claim that he suffered damages is too speculative and

unsupported by the evidence in the record to be decided by a jury

Defendants argue that there is no evidence in the record that could allow a jury to award

Plaintiff damages without engaging in impermissible speculation. Motion for Summary

Judgment at 15. Defendants argue they are entitled to summary judgment on Plaintiff's claim for

"severe permanent life altering injury" because there is no evidence that Plaintiff in fact suffered

any permanent life altering injuries *Id.* This argument rehashes Defendants' arguments for

excluding Dr. Suite and Martinez's testimony, and must fail for the same reasons those

arguments failed. The Court will deny Defendants' Motion for Summary Judgment as to the

speculative basis of Plaintiff's damages claims.

v.   Whether Defendants are entitled to summary judgment on Plaintiff's claims for

punitive damages because there is no evidence in the record to support an

inference that Defendants acted outrageously

Defendants finally argue that there is no evidence in the record that Defendants acted

"reckless[ly] or [in] callous indifference to the federally protected rights of others." Motion for

Summary Judgment at 17 (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983) (alterations added)).

Put differently, Defendants argue that evidence "of deliberate indifference to a serious medical

need, while establishing liability under § 1983, does not necessitate a finding of callous

indifference warranting punitive damages." *Coleman v. Rahija*, 114 F.3d 778, 787 (8th Cir.

1997). In *Coleman*, the Eighth Circuit Court of Appeals held that there was sufficient evidence to

conclude that the defendant had been deliberately indifferent to the plaintiff's pregnancy-

associated pain and "precipitous labor," but vacated a punitive damages award because the

nurse's conduct was not sufficiently egregious. *Id.* at 786, 787.

The Tenth Circuit Court of Appeals has not directly addressed this question. *Lavicky v. Burnett*, 758 F.2d 468 (10th Cir. 1985), a case cited in *Coleman*, upheld a district court's grant of a judgment n.o.v. on the plaintiff's claim for punitive damages because there was no evidence the defendant displayed any "ill will, desire to injure, reckless indifference or malice" towards the plaintiff. 758 F.2d at 477. The Court largely agreed with the district court's reasoning, saying that there was simply "no evidence of malice, wantonness or oppressiveness to justify punitive damages." *Id.* But *Lavicky* addressed punitive damages in the context of the defendants' alleged violations of the Fourth Amendment's warrant requirement, which only required the plaintiff to show that a "reasonable officer" in the defendants' position would have known he was violating the Plaintiff's rights. *Id.* at 475.

The Court will deny the Motion for Summary Judgment as to Plaintiff's punitive damages claim. It is true that a jury could conclude that the evidence in the record shows that Defendants were not negligent. Or that they were negligent, but not reckless. Or that they were subjectively reckless, but not wanton or callous in their disregard for Plaintiff's injuries. But the jury must assess whether the circumstantial evidence in the record and the evidence presented at trial establish that Defendants' conduct is sufficiently egregious to warrant an award of punitive damages.

IV.     **Conclusion**

IT IS ORDERED THAT

(1)     Defendants' Motion to Strike Van Blaricom (Doc. No. 139) is GRANTED IN PART as to Van Blaricom's conclusion that Defendants were "deliberately indifferent" to Plaintiff's obvious medical need and his opinions regarding Plaintiff's treatment in ECDC. It is otherwise DENIED;

(2)     Defendants' Motion to Strike Moore is GRANTED IN PART as to the legal conclusions in her report and testimony. It is otherwise DENIED;

(3)     Defendants' Motion for Qualified Immunity (Doc. No. 142) is DENIED as to Counts I, II, and III of Plaintiff's Amended Complaint; it is GRANTED as to Count IV;[20]

(4)     Defendants' Motion to Strike Suite (Doc. No. 140) is GRANTED IN PART with respect to his opinion that Defendants were "deliberately indifferent" to Plaintiff's obvious medical need. It is otherwise DENIED;

(5)     Defendants' Motion to Strike Martinez (Doc. No. 137) is DENIED; and

(6)     Defendants' Motion for Summary Judgment (Doc. No. 141) is DENIED.

_James A. Parker_
_____
SENIOR UNITED STATES DISTRICT JUDGE

---

[20] Count IV appears to allege almost identical claims against Defendant Walker as the claims in Count III. To the extent that Count IV reasserts a claim for professional negligence against Nurse Walker, the Court denies the Motion for Qualified Immunity as to Count IV.